512 So.2d 725 (1987)
HOFFMAN-LA ROCHE, INC.
v.
Hugh CAMPBELL.
85-123.
Supreme Court of Alabama.
July 10, 1987.
*726 Fournier J. Gale III, James L. Goyer III, and James M. Proctor II, of Maynard, Cooper, Frierson & Gale, Birmingham, for appellant.
William G. McKnight and George Beck, Montgomery, for appellee.
BEATTY, Justice.
The appellant, Hoffman-La Roche, Inc. ("Roche"), appeals from a judgment of the Etowah Circuit Court entered upon jury verdicts against it on both a count of breach of an employment contract and a count of fraud. The action had been filed by a former employee, Hugh Campbell. The jury assessed damages at $150,000. The determinative issue on appeal is whether certain provisions contained in an employee handbook issued by Roche modified the employment relationship which existed between Roche and Campbell so as to make the relationship terminable only by compliance with those provisions.
Campbell was hired by Roche as a pharmaceutical sales representative in October 1974. Prior to his acceptance of the position, he had engaged in several discussions with E.P. Delk, a division sales manager of Roche. During these discussions, he was informed of various benefits which Roche made available to its employees. Delk also discussed with Campbell the general responsibilities of a Roche salesman and a potential conflict of interest that existed because of Campbell's part ownership of a drug store. He was given a pre-employment physical examination by a physician of Roche's choosing and, even though he had earlier been involved in an accident which had caused serious injury to his left leg, was found physically able to perform the job.
Subsequently, Campbell and Roche entered into a written agreement, which was characterized by Delk during his testimony as "an agreement to employ Mr. Campbell for certain compensation and certain conditions *727 stated in that contract." The document itself stated that Campbell must, among other things, give up his interest in the drug store and agree not to disclose any trade secrets or confidential information to which he might become privy while in the employ of Roche, "[i]n consideration of the employment or continued employment of EMPLOYEE [Campbell] by Roche and of salary, wages or other compensation to be paid by ROCHE to EMPLOYEE."
At the time of his hiring, Campbell was also given a copy of an employee handbook entitled "Roche Employee Handbook." He was instructed to become familiar with the provisions of this handbook. During his employment at Roche, this handbook was "updated" on several occasions.
Campbell's position with Roche required him to call upon physicians, drug stores, and hospitals in a specific territory in northeast Alabama. During his first year with Roche, he received various sales awards for outstanding performance. Among these awards was the highest award one could attain at Roche.
In 1978, however, Campbell began to experience health problems. Over the next several years, he received treatment at various hospitals, and various diagnoses were made before, ultimately, in April 1980, a correct diagnosis was made at the University of Alabama at Birmingham Hospital Infectious Disease Center. Surgery was performed as part of the treatment for his illness. As a result of this lingering illness, caused by an infectious organism that had attacked the bone in his left leg, Campbell's work performance slipped.
On September 19, 1980, he was given an "unacceptable" performance rating by his supervisor. He was told that if his performance did not improve "in three months," he would be terminated. It is not clear from the record whether this three-month period was to start immediately (as of September 19, 1980) or at some later date. What is clear, however, is that at this time Campbell was still recuperating from his surgery and was in a full leg cast. In early January 1981, he was placed on "probation." Then, on January 31, 1981, he was informed by a telegram that he had been terminated. The telegram stated no reason for this termination. However, Roche's contention, as set out in the pre-trial order, was that the termination was based upon Campbell's deteriorating job performance. The testimony at trial supported this contention. No other reason was given at trial.
Campbell testified that, in late 1978, he had talked with his supervisor, Delk, about his deteriorating health when he inquired as to whether he should take sick leave or keep on working. Delk advised him to "keep working." Campbell testified that, throughout the time of his illness, he abided by Delk's instructions not to take sick leave. Instead, he would simply notify Delk and the company when he was sick, and he worked when he could. He used a form provided by the company to report these "sick" days. He testified that the use of this form was the "customary and accepted" method used to report sick days during his time with the company.
Delk's testimony differed sharply from that of Campbell. Delk testified that, although Campbell had indicated earlier that he was "not 100%," he never informed him that his problems were affecting the performance of his work. He testified that Campbell never requested sick leave.
It was stipulated to by the parties that Roche became a self-insurer of the benefits program it made available to its employees. It was Campbell's argument at trial that Roche had dismissed him so as to avoid paying him those benefits he had been promised through the issuance of an employee handbook.
On appeal from the judgment entered on the jury verdict against it, Roche argues that the employment agreement signed by Campbell did not set out a definite duration of employment and, therefore, that Campbell was an employee at will and could have been terminated for any reason or, even, for no reason at all. Campbell, on the other hand, argues that the jury's verdict is correct because Roche limited its right to terminate him by its issuance of an employee handbook containing certain provisions *728 specifying the only procedures by which an employee could be discharged. He argues that Roche did not follow those procedures.
By now, the rule is well settled in Alabama that an employee contract at will may be terminated by either party with or without cause or justification. See, e.g., Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala.1984); Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977). This means a good reason, a wrong reason, or no reason. Hinrichs, supra.
The cases reveal that three elements must be shown to establish that an employment contract is one other than one terminable at will: (1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982); (2) that the hiring agent had authority to bind the principal to a permanent employment contract, Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939); and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered, United Security Life Ins. Co. v. Gregory, 281 Ala. 264, 201 So.2d 853 (1967). This Court has repeatedly refused to modify this doctrine even so much as to recognize a so-called public policy exception to its application. Thus, we have refused to recognize an exception where an employee had been dismissed for refusing to commit a criminal act, see, e.g., Jones v. Ethridge, 497 So.2d 1107 (Ala.1986); Williams v. Killough, 474 So.2d 680 (Ala. 1985), or where an employee had been dismissed because he filed a workmen's compensation claim, see Meeks v. Opp Cotton Mills, Inc., supra, or where an employee had been dismissed because he responded to a subpoena for jury duty, see Bender Ship Repair, Inc. v. Stevens, 379 So.2d 594 (Ala.1980).[1]
The Court continues to adhere to the above-stated principles today. Indeed, in this case, we are not asked to abrogate the employment-at-will doctrine. We are asked only to determine what effect certain provisions set out in an employee handbook had upon the employer's right to exercise its powers to terminate the employment relationship at will.
The appellant argues that this Court has already addressed this question in White v. Chelsea Industries, Inc., 425 So.2d 1090 (Ala.1983). In that case, it was said:
"Relying on the employee handbook, plaintiff alleges that an implied contract existed between himself and the company and that his employment was not terminable at will. A copy of the handbook was supplied to us with the record on appeal. After reviewing the handbook, we conclude that it does not create a binding employment agreement and that Mr. White's employment relationship with the company was terminable at the will of either party. Courts faced with claims similar to that in the instant case in which employees contended that a handbook rose to the level of a contract of employment support our conclusion and have held that the handbook does not vary the general common law rule that an employee is terminable at will...."
425 So.2d at 1090.
The statements made in White are limited to the facts of that case, and are not to be taken as standing for the proposition that a handbook may never rise to the level of a contract. Indeed, in White, no determination on the effect of the handbook was made until after the contents of the handbook were "reviewed." Such a review would not have been necessary if the issuance of a handbook could not, under any circumstances, have created a contractual agreement between the employer and the *729 employee. Such a rule would also be contrary to traditional contract law principles. A review of our cases reveals that we have not applied such a rule.
In Duff v. American Cast Iron Pipe Co., 362 So.2d 886 (Ala.1978), this Court found that the violation of a rule contained in an employee handbook was a "contractual precondition to discharge." 362 So.2d at 888. Similarly, in Green v. American Cast Iron Pipe Co., 446 So.2d 16 (Ala.1984), rules contained in an employee handbook were given contractual significance. See also Smith v. American Cast Iron Pipe Co., 370 So.2d 283 (Ala.1979).
It is argued that these cases do not actually stand for the proposition that a communication made by the issuance of an employee handbook can actually be given contractual status because all of these cases dealt with the unique relationship that exists between American Cast Iron Pipe Company ("ACIPCO") and its employees. In Farlow v. Adams, 474 So.2d 53, 56 (Ala.1985), it was said:
"The case at hand involves a unique situation where employment contract principles are not exclusively applicable, and neither are principles of law concerning trusts exclusively applicable. ACIPCO's unique corporate structure is such that this Court is presented with a case of first impression which requires us to harmonize these two areas of the law involving the rights of employees."
(Emphasis added.)
While we acknowledge that the relationship between ACIPCO and its employees was unique and that, indeed, the relationship was not governed "exclusively" by the principles of either contracts or trusts, this does not detract from the fact that, in those cases, the provisions of the handbooks were given contractual force.
Further, we note that the "ACIPCO cases" are not the only cases in which this Court has given contractual significance to the language used in an employee handbook. In Davis v. Marshall, 404 So.2d 642, 644-45 (Ala.1981), for example, this Court reversed a summary judgment that had been granted against the plaintiff and said:
"The theories upon which Davis contends she is entitled to recover from Mann's, although not clearly articulated in her complaint, seem to be:
". . . .
"III. That Mann's breached an agreement, embodied in its Employee Handbook, to pay Davis for holidays, vacations, and overtime.
". . . .
"As to ... III above, it is possible there could be a scintilla of proof of a conceivable set of facts that might create genuine issues of material facts permitting recovery under a cognizable theory or theories of law." (Footnote omitted.)
Indeed, our examination of a number of cases from other jurisdictions that have considered the issue reveals that an increasing number of jurisdictions have given contractual effect to language contained in handbooks. See, e.g., Vinyard v. King, 728 F.2d 428 (10th Cir.1984); Greene v. Howard University, 412 F.2d 1128 (D.C. Cir.1969); Leikvold v. Valley View Community Hospital, 141 Ariz. 544, 688 P.2d 170 (1984) (en banc); Pugh v. See's Candies, Inc., 116 Cal.App.3d 311, 171 Cal. Rptr. 917 (1981); Salimi v. Farmers Ins. Group, 684 P.2d 264 (Colo.Ct.App.1984); Piper v. Board of Trustees, 99 Ill.App.3d 752, 55 Ill.Dec. 287, 426 N.E.2d 262 (1981); Dahl v. Brunswick Corp., 277 Md. 471, 356 A.2d 221 (1976); Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (1980); Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn.1983); Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983); Forrester v. Parker, 93 N.M. 781, 606 P.2d 191 (1980); Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982); Langdon v. Saga Corp., 569 P.2d 524 (Okla.Ct. App.1976); Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984) (en banc).
These courts have recognized, as we do, that all employee handbooks are not simply "`corporate illusion[s], "full of sound ... signifying nothing."'" Weiner v. McGraw-Hill, Inc., 83 A.D.2d 810, at 810-11, 442 N.Y.S.2d 11, 11 (1981), Kupferman, *730 J., dissenting, quoting W. Shakespeare, Macbeth, V, v, 27-28, as quoted in Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, at 462, 443 N.E.2d 441, at 443, 457 N.Y.S.2d 193, at 195 (1982). The two leading cases representative of those jurisdictions according legal significance to language contained in employee handbooks are Toussaint v. Blue Cross & Blue Shield, supra, and Pine River State Bank v. Mettille, supra.
In Toussaint, the Supreme Court of Michigan upheld a jury verdict for a plaintiff, an employee at will, who claimed he had been discharged without just cause in violation of his employer's personnel manual, which provided that employees would be terminated for just cause only, pursuant to certain procedures. 408 Mich. at 595, 597-98, 292 N.W.2d 883-84. In doing so, it held that:
"1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite termthe term is `indefinite,' and
"2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements."
408 Mich. at 598, 292 N.W.2d at 885. It also held that:
"[E]mployer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in preemployment interviews and the employee does not learn of its existence until after his hiring."
408 Mich. at 614-15, 292 N.W.2d at 892.
The Toussaint court's theory, basically, is one of estoppel, invoking the idea of reliancealthough the rationale also recognizes that both parties, the employer and the employee, benefit from the establishment of employment policies:
"While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation `instinct with an obligation.'"
408 Mich. at 614-15, 292 N.W.2d at 892. (Footnote omitted.)
It was argued to the Toussaint court that "mutuality of obligation" was lacking in such a situation because, although the employer would be obligated to continue the relationship until the prescribed conditions had been met, the employee would not be so obligated. However, the court rejected this argument:
"The enforceability of a contract depends, however, on consideration and not mutuality of obligation. The proper inquiry is whether the employee has given *731 consideration for the employer's promise of employment.
"The `rule' is useful, however, as a rule of construction. Because the parties began with complete freedom, the court will presume that they intended to obligate themselves to a relationship at will.
"To the extent that courts have seen the rule as one of substantive law rather than construction, they have misapplied language and principles found in earlier cases where the courts were merely attempting to discover and implement the intent of the parties."
408 Mich. at 600, 292 N.W.2d at 885. (Footnote omitted.)
In Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn.1983), the Supreme Court of Minnesota was faced with the issue of whether a handbook could become a part of an existing employment-at-will contract.
The Minnesota court approached the handbook problem as follows:
"Whether a handbook can become part of the employment contract raises such issues of contract formation as offer and acceptance and consideration.
". . . .
"Generally speaking, a promise of employment on particular terms of unspecified duration, if in form an offer, and if accepted by the employee, may create a binding unilateral contract. The offer must be definite in form and must be communicated to the offeree. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions. Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 532, 117 N.W.2d 218, 221 (1962). An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer. Thus, in Degen v. Investors Diversified Services, Inc., 260 Minn. 424, 110 N.W.2d 863 (1961), where the employee was told he had a great future with the company and to consider his job as a `career situation,' we said these statements did not constitute an offer for a lifetime employment contract.
"If the handbook language constitutes an offer, and the offer has been communicated by dissemination of the handbook to the employee, the next question is whether there has been an acceptance of the offer and consideration furnished for its enforceability. In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer. We have so held in Stream v. Continental Machines, Inc., 261 Minn. 289, 293, 111 N.W.2d 785, 788 (1961), and Hartung v. Billmeier, 243 Minn. 148, 66 N.W.2d 784 (1954) (employer's promise of a bonus made after the employee started working held enforceable).
". . . .
"We conclude, therefore, that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract."
333 N.W.2d 625-27. (Footnote omitted.)
We find the unilateral contract analysis set out in Pine River to be both consistent with sound traditional contract principles and in accord with existing Alabama caselaw.[2] In fact, the very same analysis has been applied by this Court in similar circumstances in the past.
*732 In Louis Werner Sawmill Co. v. Vinson & Bolton, 220 Ala. 210, 124 So. 420 (1929), it was recognized that, although a unilateral contract that is wholly executory lacks mutuality and is unenforceable, to the extent the agreement has been performed by the promisee it is binding and enforceable:
"[W]here one party performs in reliance upon such an agreement, his performance raises, to its extent, a new consideration for the promise of the other."
220 Ala. at 212, 124 So. at 422.
The concept of mutuality of contract was discussed as follows in Hill v. Rice, 259 Ala. 587, 67 So.2d 789 (1953).
"The respondents contend that the contracts lack mutuality because no obligation is placed on the complainant to provide any work for them from which they could derive compensation; that the contracts firmly bind the respondents, while under paragraph 2 thereof it is expressly provided that `there shall be no fixed minimum or other provision with regard to the total number of hours that the employee shall be actively engaged.' We have no difficulty in concluding that so long as the contracts remained wholly executory and unperformed, they lacked that mutuality of obligation essential to an enforceable contract. As stated in Alabama City, G. & A. Ry. Co. v. Kyle, 202 Ala. 552, 558, 81 So. 54, 60:
"`It is indispensable to the validity of a contract that it should be mutually obligatory upon both parties, or it will bind neither. * * *
"`All contracts founded upon mutual promises between persons of full age must be obligatory upon both parties, so that each may have an action upon it, or neither will be bound. The whole doctrine rests, though, mainly upon the absence of a consideration to support the promise. * * *'
". . . .
"As indicated in the Kyle case, supra, a contract lacking in mutuality is unenforceable mainly because there is an absence of consideration moving from one party to the other. Whether there is sufficient consideration to give validity to contracts such as we have here depends upon the facts and circumstances in each particular case.
". . . .
"... [T]he test of mutuality is not to be applied as of the time when the promises are made, but more properly as of the time when one or the other of the promises is sought to be enforced. It may be stated as accepted doctrine that absence of inceptive mutuality constitutes no defense to the enforcement of an executed contract supported by a sufficient consideration.

"Our cases approve the principle that although an agreement might not be binding on both parties at the time of its execution, it may be made so by performance under it. In Pratt Consolidated Coal Company v. Short, 191 Ala. 378, 391, 68 So. 63, 67, it is thus stated:
"`* * * If the party in whose favor a "unilateral promise is made accept[s] its performance, or do[es] any act in recognition of its implied or intended, though unexpressed, consideration, this supplies the element of mutuality, and gives a right of action." * * *'
"See also Majestic Coal Co. v. Anderson, 203 Ala. 233, 234, 82 So. 483; Jones v. Lanier, 198 Ala. 363, 73 So. 535; Pullman Co. v. Meyer, 195 Ala. 397, 401, 70 So. 763; Davis v. Williams, 121 Ala. 542, 546, 25 So. 704."
259 Ala. at 594-95, 67 So.2d at 796-97. (Emphasis added.) Accord, Sherrill v. Alabama Appliance Co., 240 Ala. 46, 197 So. 1 (1940) ("if there is other consideration, there need not be" mutuality of obligation); Miller v. Thompson, 229 Ala. 267, 156 So. 773 (1934) ("performance supplies the element of mutuality necessary as a consideration to support the obligation" in a unilateral contract situation).
Just such an analysis was applied in Henderson Land & Lumber Co. v. Barber, 17 Ala.App. 337, 85 So. 35 (1920) to uphold the finding of an enforceable contract, though unilateral in nature, between an employer and employee when the employer promised to pay the employee a 5 percent *733 bonus above the employee's normal salary if he continued to work 4 months straight time, even though he was not required to do so. The Court of Appeals set out the analysis used in that case:
"The defendant, being a large sawmill operator, employing many men, and desiring continued, uninterrupted service from its employees, made and posted through the plant the following notice:
"`To the employees of the Henderson Land & Lumber Company:
"`Beginning February 1, 1918, we will give a 5 per cent bonus to every piece work), making four (4) months' straight time. The 5 per cent will also apply to all time made extra or overtime and will be paid at the expiration of four (4) months.
"`We want to impress upon each of you that it is very important that you be on hand and carry out your part of the work and do everything possible to keep the mill going, whether it is in your department or not, as we want to do everything in our power to help the Boys who are fighting for us.
"`If, however, a man is sick and unable to work and is vouched for by the doctor as being unable to perform his duties, he is not to lose what portion of the four (4) months' time he has made. Respectfully, "Henderson Land & Lumber Company.'
"The plaintiff knew nothing of this offer until after he had made the agreement to work for $135 per month, beginning February 1st, but after reading the notice did remain in the service of defendant and worked continually during the months of February, March, April, and May, and was paid therefor by the defendant $135 for each month's work, but was not paid the bonus of 5 per cent, named in the notice, for which he now sues. There was some conflict in the evidence as to what took place and was said between defendant's superintendent and plaintiff regarding the bonus, as to whether it applied to him, and this question was submitted to the jury, under the charge of the court.
"There is no mutuality in a unilateral contract, until the party claiming under it has complied with the terms of the proposition. When, however, one makes a promise conditioned upon the doing of an act by another, and the latter does the act, the contract is not void for want of mutuality, and the promisor is liable; for upon performance of the conditions by the promisee the contract becomes clothed with a valid consideration which relates back and renders the promise obligatory. 6 R.C.L. p. 687, § 94. It is an elementary principle that, where one publishes an offer, and before it is withdrawn another acts upon it, the one making the offer is bound to perform the promise; in other words, the [offer] becomes binding when the act is performed. Hilton v. Southwick, 17 Me. 303, 35 Am.Dec. 253; Morse v. Bellows, 7 N.H. 549, 28 Am.Dec. 372; Todd v. Weber, 95 N.Y. 181, 47 Am.Rep. 20; American Oak Extract Co. v. Ryan, 104 Ala. 274, 15 South. 807; Sheffield Furnace Co. v. Hull Coal & Coke Co., 101 Ala. 446, 14 South. 672.
"Under the terms of the offer published by defendant, it applied to `every man in our employ (except men doing piece work).' Plaintiff was certainly in the employ of defendant at the time the offer was made, and performed service in that capacity for the term stipulated. We can see no reason why, if his testimony is to be believed, which we must do on appeal, he is not within the terms of the offer."
17 Ala.App. at 338, 85 So. at 35-36.
The foregoing considered, we see no reason why a policy contained in an employee manual issued to an employee cannot become a binding promise once it is accepted by the employee through his continuing to work when he is not required to do so. Such a performance clearly provides any consideration necessary to the contract.[3] The fact that the promise is *734 communicated to the employee through the medium of a handbook, rather than by some other means, is simply of no consequence.
Of course, to become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. See Pine River, supra, at 626. However, whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs. See Mayo v. Andress, 373 So.2d 620 (Ala.1979). It is axiomatic that an offer must be communicated before it may be accepted. See generally, S. Williston & G. Thompson, Selections from Williston's Treatise on the Law of Contracts, § 33, at 37 (Rev. ed. 1938). Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook. Thus, this Court has refused to hold the provisions of a handbook enforceable against an employer where the handbook at issue expressly stated the following:
"This Handbook and the policies contained herein do not in any way constitute, and should not be construed as a contract of employment between the employer and the employee, or a promise of employment."
McClusky v. Unicare Health Facility, Inc., 484 So.2d 398, 400 (Ala.1986).
We do not find the indefinite nature of the time period for performance to be a bar to enforcement of a unilateral contract. On this issue, we agree with the reasoning found in Pine River:
"The ... argument, that because the contract specifies no duration the parties did not intend any job termination restrictions to be binding, is without merit. The argument misconstrues the at-will rule, which is only a rule of contract construction, as a rule imposing substantive limits to the formation of a contract. See Restatement (Second) of Agency, § 442, comment a (inference that employment is at-will may be rebutted by specific terms of the agreement).
"The cases which reason that the at-will rule takes precedence over even explicit job termination restraints, simply because the contract is of indefinite duration, misapply the at-will rule of construction as a rule of substantive limitation on contract formation. See, e.g., Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779 (1976); Shaw v. S.S. Kresge, 167 Ind.App. 1, 7, 328 N.E.2d 775, 779 (1975); Uriarte v. Perez-Molina, 434 F.Supp. 76 (D.C.D.C.1977). It should not be necessary for an employee to prove a contract is of `permanent' employment or for a specified term in order to avoid summary dismissal if the parties have agreed otherwise. There is no reason why the at-will presumption needs to be construed as a limit on the parties' freedom to contract. If the parties choose to provide in their employment contract of an indefinite duration for provisions of job security, they should be able to do so."
333 N.W.2d at 628. Indeed, the rules set out above regarding the enforcement of a unilateral contract do not require that any definite time period for performance have been set or agreed to. Instead, the rule is stated that the agreement is enforceable to the extent that it has been performed. See, e.g., Louis Werner Sawmill Co., supra.
Neither do we find that the possibility of enforcement of those specific policies set out in an employee handbook creates an unduly inflexible environment for the issuance of employment guidelines, rules, policies, or benefits. As explained by the Oklahoma Court of Appeals in Langdon v. Saga Corp., 569 P.2d 524, 527-28 (Okla.Ct. App.1976), an employer is bound by the stated policies only to the extent that the benefits have accrued or performance has been made by the employee:

*735 "Where an employee at will forgoes options to refuse future performance in reliance or in partial reliance on articulated personnel policies of the employer, the employer is bound by those policies insofar as they have accrued to an employee for performance rendered while they were in effect and have not been excluded or modified by another valid contractual arrangement. The employer remains free to modify such policies prospectively and to the extent there is no accrual, as in the case of vacation and severance pay in the instant contract...."
See also Pine River, 333 N.W.2d at 627 ("Unilateral contract modification ... may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify the handbook provisions."); Toussaint, 408 Mich. at 619, 292 N.W.2d at 894-95 ("Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer"). In this sense, the unilateral offer made by the employer may be characterized, as it was by one commentator, as follows: "I promise I will not dismiss you without cause (or without exhausting specified procedures) unless I change this policy before you are discharged." H. Perritt, Employee Dismissal Law and Practice, 150 (1984).[4]
In summary, we find that the language contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract. The existence of such a contract is determined by applying the following analysis to the facts of each case: First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration.
Applying the above analysis to the facts of the present case, we find that, as a matter of law, there existed a unilateral contract between Campbell and Roche.
The handbook at issue contains, in pertinent part, the following language:
"This handbook is for all employees of Hoffman-La Roche, Inc.
". . . .
"This handbook is designed to make it easy for us to work together at Roche. It describes the various aspects of our careers at Roche. All of the areas that affect our relationship with the company are discussed here in simple terms.
"The handbook explains policies and practices that are quite detaileddetailed because they must be applied fairly to many different people in many different situations. The actual documents that set forth company policies and practices will govern if there is ever any difference in interpretation between this handbook and the documents.
". . . .
"The handbook should be your first reference if you have a question about company procedure in any of the areas listed in the tables of contents. If you don't find what you need, then check with your supervisors.
"The handbook is comprehensive in the number of subjects it covers; in addition, it includes examples of various personnel and pay policies in action so that you can see more clearly how they might affect you. If you need to discuss the exact effect of a procedure on your own particular situation, your supervisor can help you.
"Because personnel and pay policies and company practices are designed by people for people, they change from time to time. Your handbook will reflect this, it will be updated periodically so that the information is always as current as possible. When a new page is issued, simply use the date and section codes to locate *736 the old page in the handbook and then replace it."
In a section entitled "termination of employment-permanent employees" is the following:
"If Roche has to terminate your employment, you will be given a printed explanation of the termination process (Termination Procedure Forms). The material summarizes the status of your benefits, but you should also look at your printed benefit materials for further information.
"(This paragraph does not apply to field sales personnel.) Before you terminate you will be asked to have a physical examination at Employee Health Services and to obtain clearance signatures indicating that you have returned your identification badge and completed any other duties related to ending association with your department. You will also be asked to have a final interview with the Personnel Department. That department will review all termination procedures with you to make sure you understand and comply with them.
"As part of the process, the Payroll Department and the HLR Credit Union will determine whether any money is owed you or whether you owe any money. Arrangments will be made for repayment.
"You will be paid for all time worked through your last day."
In this same section, under the title "types of termination" is the following:
"There are five types of termination.
"Retirement under the Retirement Plan: When you retire you will receive a pension from Roche. You'll be given a booklet explaining all of the benefits that are available to you through Roche.
"Resignation: If you voluntarily leave the company you must give at least two weeks' notice so that your supervisor can arrange for transition of work and/or fill your position.
"Layoff: Circumstances such as lack of work may force the company to terminate you subject to recall. If you are recalled within a year of the date of layoff, you will be reinstated without loss of seniority.
"Discharge for Performance: The company will discharge an employee who is considered unable to meet the requirements of his or her job. This person is not eligible for recall or reinstatement.
"Disciplinary Discharge: The company can terminate employment on the grounds of misconduct or willful negligence. In such cases, an employee will not be considered for reemployment."
The language used in this handbook is clear enough that an employee reading it could reasonably believe that, as long as he worked within the guidelines set out in the handbook,[5] he would not be terminated until *737 all procedures set out in the handbook had been followed, including the reasons and circumstances for termination in the handbook.
It is not disputed that Campbell continued to work after the handbook had been issued.[6] By his retention of employment after he had become aware of the handbook (offer), he accepted the unilateral contract. His performance under this contract supplied the necessary consideration and bound Roche to follow the procedures set out in the handbook. There has been no argument made, nor is there any inference possible from the record, that these policies had been modified by the issuance of any new or modified handbook after the one in the record had been issued.
Campbell argues that Roche breached this contract by discharging him for unsatisfactory performance of his job when (1) he was too ill to satisfactorily perform the job and (2) he had been instructed by his supervisor not to take advantage of the sick leave benefits which were available to him as a Roche employee.[7] He points out that, by the express language of the handbook, Roche agreed that the policies and practices expressed therein would be "applied fairly." We note that evidence exists in the record from which a jury could have found both that Campbell was too ill to satisfactorily perform the job and also that he had been instructed by his supervisor, who was aware of the physical problems Campbell was having, not to take advantage of the company's sick leave benefits.
Campbell expresses this argument as Roche's having violated its obligation to perform the contract in "good faith and fair dealing." Roche, on the other hand, argues that it was not required to act with good faith. More specifically, it argues that the trial court erred in giving the following charge to the jury:
"I further charge the jury that the law of this state writes into every contract, *738 an implied obligation or duty of good faith and fair dealing between the parties to the contract. In determining whether the employee was wrongfully discharged as plaintiff claims in this case, you must decide whether the employer used or utilized good faith and fair dealing in making its decision to terminate the plaintiff under all of the facts and circumstances which you have heard from the evidence. Specifically, in making a determination to discharge the employee for failure to live up to performance standards of the employee, in light of the evidence presented by the plaintiff as to the plaintiff's incapacity or disability during this period of time, it and [sic] the Court further charges the jury that the physical and mental capability of the plaintiff, to comply with such performance standards of the employer, was an implied condition precedent to violation of the company rule or standard. In other words, the Court charges you that you must find that the employee, the plaintiff in this instance, was physically and mentally capable of performing up to the company's standards before you can find that the employee violated the performance standards set by the company."
Specifically, Roche argues that the effect of this instruction was to "submit to the jury a claim for bad faith on plaintiff's termination of employment."
We find no error in the judge's charge and agree with Campbell's argument that Roche's discharge of him, under the circumstances of the present case as they could have been found by the jury, constitutes a breach of contract.
Alabama recognizes the general rule that "every contract does imply [an obligation of] good faith and fair dealing." Kennedy Electric Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983); see also Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala. 1986). This obligation is described in Corbin on Contracts, § 654A(A) (Kaufman supp.1984) (hereinafter cited as "Corbin § ___") as simply "the obligation to preserve the spirit of the bargain rather than the form," and that "[i]t is moreover a group of specific rules which evolved to insure that the basic purpose of contract law is carried out, the protection of reasonable expectations of parties induced by promise." Apparently, a majority of jurisdictions now recognize this obligation. See Corbin § 654A(B).
One facet of this obligation of good faith is explained in Corbin § 654E(A):
"It is a basic principle that justice is not served when somebody gets something for nothing, other than by the conscious free will of the giver.... The spirit of the bargain usually contemplates that a contracting party shall not try to deprive the other of the consideration for which he bargained, though of course there are exceptions; Corbin gives the example of the bet that one's team will win a sporting contest, where vigorous attempts to deprive the other party of victory are contemplated. Besides forbidding attempts to prevent the other party from getting the consideration for which he bargained through breach or use of technical provisions contained in the contract, this principle of justice forbids attempts by the actor to get more for himself than the other party reasonably contemplated giving him at the time the contractual relationship was entered into, absent good cause. Either kind of motive to evade the spirit of the bargain is condemned...."
Roche violated this obligation when it discharged Campbell for unsatisfactory performance even though it was aware of his physical inability to perform satisfactorily.
We note that this obligation of "good faith" arises as part of the contract. Its breach does not give rise to an action in tort. Harrell, supra; Kennedy, supra. On the facts of the present case, it may simply be expressed as a finding that there necessarily exists an implied or constructive condition precedent to the firing of Campbell for unsatisfactory performance, i.e., that he be physically able to satisfactorily perform. We made a similar determination in Duff v. American Cast Iron Pipe Co., supra.
*739 In Duff, an employee had been discharged for violating a company rule which provided that an employee could be discharged for:
"Absence for a period of 14 calendar days without acceptable excuse made known to immediate supervisor."
The employee sued for reinstatement and back pay. The evidence showed that, at the time the 14-day period had ended, the employee was mentally incapable of complying with the rule. We reversed a judgment for the employer, reasoning as follows:
"We believe that Rule 24 necessarily contains an implied condition precedent, presupposing that the employee affected by it is mentally and/or physically capable of compliance. In this case the facts establish without dispute that Duff was mentally incapacitated and could not perform his responsibilities under the rule on the 14th day of the Rule 24 period. ACIPCO admits as much.
"In American Chain & Cable Co., 48 LA (Labor Arbitration Reports) 1369, Arbitrator David Keefe found that an employer was not justified in discharging an employee who was absent without notice where a psychosis caused her to lose her ability to respond to ordinary responsibilities. The arbitrator said:
"`In every case, the employee is expected to and must comply with the rule for reporting the absence and going on sick-leave. The only obvious exclusion from this all-embracing responsibility would be when the patient is in coma, as from a serious accident, and has not the power to make or instigate such a report. It is rather difficult to conceive that a person, physically capable ... could, from psychotic reasons, lose the ability to respond to ordinary responsibilities. Such, however, is the caseand the actuality in this instance.'
"Because of his incapacity we hold discharge was improper on June 7th and therefore wrongful under law. Because an acceptable reason for absence was present, Plant Rule 24 was not violated and thus discharge under it was improper...."
362 So.2d at 888-89.
Even if such an obligation of good faith and fair dealing was not necessarily implied by law, we would find such an obligation, on Roche's part, to exist in the present case. As is aptly pointed out by counsel for Campbell, the language of the handbook expressly stated that the policies and practices of Roche would be "applied fairly." Given this language, it cannot be said that it was within the reasonable expectations of the parties that Campbell could be discharged for unsatisfactory performance when he was not physically capable of satisfactorily performing.
Roche next argues that the trial court committed reversible error when instructing the jury as to the damages assessable in this case. Our review of the record indicates, however, that the plaintiff's testimony of actual damages, as computed by an expert witness, placed this damages as high as $156,839. The defendant offered no evidence as to the nature and extent of the damages. The jury returned a verdict assessing plaintiff's damages at $150,000, and there has been no complaint that such an award was excessive. Therefore, even if it were conceded that the court erred in charging the jury on damages, and it is not so conceded, no injury resulted to the defendant therefrom. Therefore, there can be no reversal on that basis. See North British & Mercantile Ins. Co. v. Sciandra, 256 Ala. 409, 54 So.2d 764 (1951); Lehigh Portland Cement Co. v. Higginbotham, 232 Ala. 235, 167 So. 259 (1936); Corry v. Sylvia Y Cia, 192 Ala. 550, 68 So. 891 (1915).
All other issues having been either addressed in or intentionally pretermitted in the foregoing discussion, the judgment of the trial court is affirmed.
AFFIRMED.
JONES, ALMON, SHORES and ADAMS, JJ., concur.
MADDOX and HOUSTON, JJ., dissent.
*740 MADDOX, Justice (dissenting).
The majority attempts to distinguish this Court's decision in White v. Chelsea Industries, Inc., 425 So.2d 1090 (Ala.1983), decided just over four years ago, and fails to discuss how this case differs from Cunningham v. Etowah Quality of Life Council, 484 So.2d 1075 (Ala.1986), decided last year, in which this Court held that an employee manual containing provisions similar to those in the handbook here did not establish a definite period of employment. When I compare the terms of the employee handbook in this case with the terms of the employee handbook in the White case, and the terms of the employee manual in Cunningham, I cannot make a distinction, and because the majority cites decisions of this Court involving American Cast Iron Pipe Company, an admittedly unique industrial organization where the employees have a part in controlling the company, I can only conclude that this Court has overruled the principle of law set out in the White and Cunningham cases. Because White was based, in part, upon this Court's case of Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977), I can only conclude that the Court has now adopted a principle of law that an employment terminable at will can be changed by the unilateral action of the employer in issuing an employee handbook or manual.
Employees in Alabama bear a heavy burden of proof to establish more than an at-will employment relationship. The law rightly considers lifetime or permanent employment contracts to be extraordinary and not lightly to be implied. Alabama Mills, Inc. v. Smith, 237 Ala. 296, 301, 186 So. 699, 704 (1939). Three elements must be shown to establish a permanent or lifetime employment contract: (1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982); (2) that the hiring agent had actual authority to bind the principal to a permanent employment contract, Alabama Mills, supra, 237 Ala. at 300-01, 186 So. at 703; and (3) that the employee provided substantial consideration separate from the services to be rendered, United Security Life Ins. Co. v. Gregory, 281 Ala. 264, 201 So.2d 853 (1967). Failure to prove one of these elements would necessitate a directed verdict for the employer, because the employee would be, by law, an employee at-will and would be, therefore, terminable for any reason, or for no reason at all. Reich v. Holiday Inn, 454 So.2d 982 (Ala. 1984); Hinrichs v. Tranquilaire Hosp., 352 So.2d 1130 (Ala.1977).
The language relied on by Campbell as establishing a definite term of employment reads as follows: "in consideration of the employment or continued employment of employee by Roche and of salary, wages or other consideration to be paid by Roche to employee, it is hereby agreed...." (Emphasis added.) Campbell asserts that this language, under the Alabama Mills decision, means that the employment relationship would continue as long as he desired to work and performed his work satisfactorily and the employer had work for him to perform. I fail to find any basis for that conclusion in the Alabama Mills decision. Rather than looking to a single word, I look at the agreement itself. A fair reading of it leads me to conclude that it did not establish a permanent employment relationship between the parties. The agreement is what it purports to be: a nondisclosure and nonconflicts agreement. Campbell, in his brief, states that Roche required all of its employees to execute this agreement, but this cannot change the nature of the agreement; clearly, it is not an agreement that would create a contract of employment other than one terminable at will. Further, it is undisputed that Campbell was never told he could not be terminated; he acknowledged that Delk could dismiss him. He had never discussed the duration of his employment with any representative of Roche, nor had he signed a contract specifying a definite duration. For these reasons, I believe that the trial court erred in allowing this question to go to the jury.
As a second theory, Campbell argues that Roche, under the terms of its employee handbook, unilaterally limited its right to terminate, because the handbook established *741 a specific procedure to be followed in disciplinary termination, and that Roche was required to exercise good faith in his termination, and that he relied on the benefits guaranteed in that handbook. However, in White v. Chelsea Industries, Inc., supra, and in Cunningham v. Etowah Quality of Life Council, supra, this Court addressed this issue and held that an employee handbook and manual, respectively, did not alter the employment relationship and establish a definite period of employment.
In White, the employee based his argument on handbook language that read:
"TERMINATION
"Any employee will be discharged if he cannot or will not do satisfactory work after proper instruction and trial, or if his behavior or attendance record does not meet the Company's minimum acceptable standards. We reserve the right to terminate any employee during the first 90 days of employment without cause...."
In White, this Court stated:
"Relying on the employee handbook, plaintiff alleges that an implied contract existed between himself and the company and that his employment was not terminable at will. A copy of the handbook was supplied to us with the record on appeal. After reviewing the handbook, we conclude that it does not create a binding employment agreement and that Mr. White's employment relationship with the company was terminable at the will of either party. Courts faced with claims similar to that in the instant case in which employees contended that a handbook rose to the level of a contract of employment support our conclusion and have held that the handbook does not vary the general common law rule that an employee is terminable at will. See e.g. Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779, 781 (1976); Chin v. American Telephone & Telegraph Co., 96 Misc.2d 1070, 410 N.Y. S.2d 737 (1978).
"In the present case, there is no agreement specifying a definite duration of employment services or limiting defendants' legal right to terminate such employment; thus there exists an employment at will. This court in Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130, 1131 (Ala.1977), summarized a principle which is well established in Alabama:
"`(1) The general rule is that an employment contract at will may be terminated by either party with or without cause or justification. 45 C.J.S. Master and Servant § 31; and 62 A.L. R.3d 271. This means a good reason, a wrong reason, or no reason.
"`(2) Alabama has followed the general rule which is that in a contract of employment "at will," the contract means what it says, that it is at the will of either party. The employee can quit at will; the employer can terminate at will. Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939). This is true whether the discharge by the employer was malicious or done for other improper reasons. Comerford v. International Harvester Co., 235 Ala. 376, 178 So. 894 (1938)....'
"The defendants in this case have met the burden of establishing that there exists no genuine issue of fact. Accordingly, the motion for summary judgment was properly granted." (Emphasis added.)
Id., at 1090-91.
In Cunningham, this Court, noting that it had read the handbook involved in that case, said:
"In reviewing this manual, neither the trial court nor this Court found any language establishing a definite period of employment for the plaintiff." (Emphasis added.)
484 So.2d at 1076.
Pertinent portions of the "manual" in Cunningham read as follows:
"I. ORIENTATION PROCEDURES
"* * * *
"C. The duration of the orientation (probationary) period will be open-ended and prescribed by the director on an *742 individual basis. In no case will the probationary period exceed 60 days.
"* * * *
"E. The new employee will sign a statement that the personnel and operating policies are understood and agreed to before being assigned to a community clinic.
"F. Employment shall not be terminated without two weeks notice stating the reasons for termination.

"* * * *"
"I. EMPLOYMENT STATUS
"* * * *
"D. Every employee will be written a letter of appointment which will be considered a legal contract for employment.

"E. Every employee will be considered `temporary' until the prescribed probationary period has been successful [sic] completed.
"* * * *
"D. DUE-PROCESS PROCEDURES
"1. Each employee will be afforded protection of employment under due-process." (Emphasis added.)
Etowah Quality of Life Council, Inc., Gadsden Neighborhood Health Clinic Policies, at 7, 9. (Not set out in Cunningham.)
In the present case, plaintiff's employee handbook read in part:
"Your first six months on the job are a probationary period in which your supervisor will evaluate your capabilities and you can become acquainted with the responsibilities of your work. During this trial period, employees can be terminated at any time if their supervisors conclude that they will not meet job performance standards after reasonable training. At the end of the six months, you are considered a regular permanent employee."
At another point, the present handbook provides under the heading Constructive Discipline, as follows:
"If disciplinary action is necessary, it generally is taken in the order below, although a serious offense might warrant taking more serious action.
"1. Oral warnings in private are an effort to correct the employee's actions.
"2. Written warnings are a more serious attempt at correction and become part of an employee's record.
"3. Suspension occurs only with the approval of the department head and division personnel manager and is without pay.
"4. Discharge occurs when management believes the employee will not change behavior patterns.
"The types of offenses for which the four-step disciplinary process would generally be followed include: tardiness, poor work performance because of negligence, excessive absenteeism, violation of company traffic or parking regulations, use of profane or abusive language, horseplay or pranks, unauthorized solicitations of any kind, posting or distributing unauthorized materials." (Emphasis added.)
The employee "manual" in Cunningham, however, also contained a section on disciplinary procedures. In pertinent part, it read as follows:
"SUBJECT: DISCIPLINARY ACTION
"PURPOSE: To establish the responsibilities and procedures for taking disciplinary action against an employee.
"I. POLICY
"When work rules are broken, fair but firm corrective action will be taken promptly. Discipline will be designed to help the employee correct his faults and accept his work responsibilities rather than merely to punish him for breaking rules. In determining appropriate disciplinary action, the seriousness of the offense, any extenuating circumstances, and the employee's work record should be considered. Each case should be considered individually and on its own merits."
Etowah Quality of Life Council, Inc., Gadsden Neighborhood Health Clinic Policies, at 22.
The "manual" also contained sections dealing with the procedure to be followed *743 in case of "INFORMAL DISCIPLINARY ACTION" and "FORMAL DISCIPLINARY ACTION," and under the heading "FORMAL DISCIPLINARY ACTION" the manual specifically dealt with "BEHAVIOR WARRANTING DISCIPLINARY ACTION" and "DISCHARGE," under which headings were listed examples "of extremely serious offenses which normally will result in the employee's discharge."
I find the principles set forth in White and Cunningham to be applicable to these handbook provisions; in my judgment the provisions of the handbook here and the provisions of the "manual" in Cunningham are indistinguishable; absent an agreement for a specified term or duration of employment, or other agreement limiting Roche's legal right to terminate, the employment is at-will.
Admittedly, the contractual status of employee handbooks has been the subject of a great deal of litigation in recent years, and this is the third time this particular court has reviewed the principle. In the past this Court, and several other courts have rejected the notion that an employee handbook or manual can create a binding contractual obligation. Cunningham, supra; White, supra; Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 506 N.E.2d 919, 514 N.Y.S.2d 209 (1987); Wells v. Thomas, 569 F.Supp. 426 (E.D.Pa.1983); Uriarte v. Perez-Molina, 434 F.Supp. 76 (D.D.C.1977) (applying D.C. law); Heideck v. Kent General Hospital, Inc., 446 A.2d 1095 (Del.1982); Muller v. Stromberg Carlson Corp., 427 So.2d 266 (Fla.Dist.Ct.App.1983); Shaw v. S.S. Kresge Co., 167 Ind.App. 1, 328 N.E.2d 775 (1975); Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779 (1976); Sargent v. Illinois Institute of Technology, 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1979); Mead Johnson & Co. v. Oppenheimer, 458 N.E.2d 668 (Ind.App.1984); Terrebonne v. Louisiana Ass'n. of Educators, 444 So.2d 206 (La.App.1983), cert. denied, 445 So.2d 1232 (La.1984); Longley v. Blue Cross & Blue Shield, 136 Mich. App. 336, 356 N.W.2d 20 (1984); Gates v. Life of Montana Ins. Co., 196 Mont. 178, 638 P.2d 1063 (1983); Buffolino v. Long Island Savings Bank, FSB, 126 A.D.2d 508, 510 N.Y.S.2d 628 (1987); Toshiba America, Inc. v. Simmons, 104 A.D.2d 649, 480 N.Y.S.2d 28 (1984); Patrowich v. Chemical Bank, 98 A.D.2d 318, 470 N.Y. S.2d 599, aff'd, 63 N.Y.2d 541, 473 N.E.2d 11, 483 N.Y.S.2d 659 (1984); Edwards v. Citibank, N.A., 100 Misc.2d 59, 418 N.Y. S.2d 269 (1979), aff'd, 74 A.D.2d 553, 425 N.Y.S.2d 327, app. dismissed, 51 N.Y.2d 875, 433 N.Y.S.2d 1020, 414 N.E.2d 400 (1980); Chin v. American Tel. & Tel. Co., 96 Misc.2d 1070, 410 N.Y.S.2d 737 (1978); Harris v. Duke Power Co., 83 N.C.App. 195, 349 S.E.2d 394 (1986), aff'd, 319 N.C. 627, 356 S.E.2d 357 (1987); Walker v. Westinghouse Elec. Corp., 77 N.C.App. 253, 335 S.E.2d 79 (1985), rev. denied, 315 N.C. 597, 341 S.E.2d 39 (1986); Richardson v. Charles Cole Memorial Hospital, 320 Pa. Super. 106, 466 A.2d 1084 (1983); Bringle v. Methodist Hosp., 701 S.W.2d 622 (Tenn. App.1985); Reynolds Manufacturing Co. v. Mendoza, 644 S.W.2d 536 (Tex.Civ.App. 1982); Holloway v. K-Mart Corp., 113 Wis.2d 143, 334 N.W.2d 570 (Wis.App. 1983).
The majority wittingly or unwittingly follows Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn.1983), which criticizes the rule announced in Johnson v. National Beef Packing Co., a case this Court used as authority for the decision in White v. Chelsea Industries, Inc., 425 So.2d 1090 (Ala.1983). In White, this Court specifically cited the cases of Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779 (1976), and Chin v. American Tel. & Tel. Co., 96 Misc.2d 1070, 410 N.Y. S.2d 737 (1978), unam. aff'd. no op., 70 A.D.2d 791, 416 N.Y.S.2d 160 (1979).
Of course, other courts, including a New Jersey court which considered a case against Hoffman-La Roche, and apparently involving the same handbook as that involved in this case, have held that an employee handbook may be contractually binding. See, e.g., Vinyard v. King, 728 F.2d 428 (10th Cir.1984) (applying Oklahoma law); Lincoln v. Sterling Drug, Inc., 622 F.Supp. 66 (D.Conn.1985) (Connecticut law); Barger v. General Electric Co., 599 F.Supp. 1154 (W.D.Va.1984) (Virginia law); *744 Smith v. Teledyne Industries, Inc., 578 F.Supp. 353 (E.D.Mich.1984) (Ohio law); Brooks v. Trans World Airlines, Inc., 574 F.Supp. 805 (D.Colo.1983) (Colorado law); Leikvold v. Valley View Community Hospital, 141 Ariz. 544, 688 P.2d 170 (1984); Pugh v. See's Candies, Inc., 116 Cal. App.3d 311, 171 Cal.Rptr. 917 (1981); Salimi v. Farmers Insurance Group, 684 P.2d 264 (Colo.App.1984); Finley v. Aetna Life & Casualty Co., 5 Conn.App. 394, 499 A.2d 64 (1985); Jackson v. Minidoka Irrigation District, 98 Idaho 330, 563 P.2d 54 (1977); Wyman v. Osteopathic Hospital of Maine, Inc., 493 A.2d 330 (Me.1985); Staggs v. Blue Cross of Maryland, Inc., 61 Md.App. 381, 486 A.2d 798 (1985); Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (1980); Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn. 1983); Enyeart v. Shelter Mutual Insurance Co., 693 S.W.2d 120 (Mo.App.1985); Morris v. Lutheran Medical Center, 215 Neb. 677, 340 N.W.2d 388 (1983); Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983); Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985); Forrester v. Parker, 93 N.M. 781, 606 P.2d 191 (1980); Bolling v. Clevepak Corp., 20 Ohio App.3d 113, 484 N.E.2d 1367 (1984); Langdon v. Saga Corp., 569 P.2d 524 (Okla.Ct.App.1976); Yartzoff v. Democrat-Herald Publishing Co., 281 Or. 651, 576 P.2d 356 (1978); Osterkamp v. Alkota Manufacturing, Inc., 332 N.W.2d 275 (S.D.1983); Hamby v. Genesco, Inc., 627 S.W.2d 373 (Tenn.App.1981); Piacitelli v. Southern Utah State College, 636 P.2d 1063 (Utah 1981); Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984); Mobil Coal Producing, Inc. v. Parks, 704 P.2d 702 (Wyo.1985).
The two most recent cases on the effect of employee handbooks that my research has located are Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 506 N.E.2d 919, 514 N.Y.S.2d 209, (1987); and Duldulao v. Saint Mary of Nazareth Hosp., 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987).
In Sabetay v. Sterling Drug, Inc., the plaintiff alleged that he was wrongfully discharged from employment because he refused to participate in certain improper, unethical, and illegal activities, and because he "blew the whistle" on these alleged activities. He was employed by a division of the Bender Corporation without a written contract, and he alleged that his dismissal was in violation of two contractual obligations, the first arising from the "Corporate Employee Relations Policy" manual and the second arising from Sterling's "Code of Corporate Conduct" and "Internal Control Guide" (together referred to as the "Accounting Code").
In that case, the New York Court of Appeals held as follows:
"It is still settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party (Martin v. New York Life Ins. Co., 148 N.Y. 117, 121, 42 N.E. 416). The original purposes of the employment at-will doctrine were to afford employees the freedom to contract to suit their needs and to allow employers to exercise their best judgment with regard to employment matters.
"In recent years, however, the unfettered power of employers to dismiss employees without cause has come under sharp scrutiny (see, Blades, Employment At Will v. Individual Freedom on Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404 (1967); and see generally, Note, Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception, 96 Harv.L.Rev. 1931 (1983)). To offset the harsh effect of the at-will doctrine and to afford workers a measure of job security, other courts have carved out exceptions to the common-law employment at-will doctrine (see, Petermann v. International Bhd. of Teamsters, 174 Cal.App.2d 184, 344 P.2d 25; Trombetta v. Detroit, Toledo & Ironton R.R. Co., 81 Mich.App. 489, 265 N.W.2d 385; Novosel v. Nationwide Ins. Co., 721 F.2d 894 (3d Cir.); Sheets v. Teddy's Frosted Foods, 179 Conn. 471, 427 A.2d 385) (recognizing claims of wrongful discharge based on dismissal for refusing to commit an unlawful act, or for performing a public obligation or for exercising a legal right); see also, *745 Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (recognizing an implied-in-law covenant of good faith and fair dealing in employment contracts which limits the right to discharge without just cause).
"In Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, this court dealt with its longstanding acceptance of the common-law rule. The plaintiff, who had begun his career with another publishing house, was invited to join the staff of McGraw-Hill. As part of its recruitment effort, McGraw-Hill's representative assured the plaintiff that it was company policy not to terminate employees without just cause, and that employment at McGraw-Hill would bring the advantage of job security. Moreover, the application form Weiner signed specified that his employment would be subject to the provisions of the McGraw-Hill handbook on personnel policies. The handbook stated that `the company will resort to dismissal for just and sufficient cause only, and only after all practical steps toward rehabilitation or salvage of the employee had been taken and failed. However, if the welfare of the company indicates that dismissal is necessary, then that decision is arrived at and is carried out forthrightly,' id., at 460-461, 457 N.Y.S.2d 193, 443 N.E.2d 441. Weiner alleged that he had relied on these assurances when he left his former employer, forfeiting accrued fringe benefits and a proffered salary increase.
"After eight years of employment, Weiner was advised that he was discharged for `lack of application,' id., at 461, 457 N.Y. S.2d 193, 443 N.E.2d 441. He sued, alleging a breach of contract. McGraw-Hill countered that there was no contract of employment and that its promises of job security were not binding. While we found for Weiner, we adhered to our view that an employer has the right to terminate an at-will employee at any time for any reason or for no reason, except where that right has been limited by express agreement. The language in the McGraw-Hill handbook, coupled with the reference to the handbook in the employment application, amounted to an express agreement between those parties limiting the employer's otherwise unfettered right to terminate its employees. We also noted that to support his breach of contract claim, Weiner had alleged the following significant factors: `[F]irst, plaintiff was induced to leave Prentice-Hall with the assurance that McGraw-Hill would not discharge him without cause. Second, this assurance was incorporated into the employment application. Third, plaintiff rejected other offers of employment in reliance on the assurance. Fourth, appellant alleged that, on several occasions when he had recommended that certain of his subordinates be dismissed, he was instructed by his supervisors to proceed in strict compliance with the handbook and policy manuals because employees could be discharged only for just cause. He also claims that he was told that, if he did not proceed in accordance with the strict procedures set forth in the handbook, McGraw-Hill would be liable for legal action.' Id., at 465-466, 457 N.Y.S.2d 193, 443 N.E.2d 441.
"Not surprisingly, because of the explicit and difficult pleading burden, post-Weiner plaintiffs alleging wrongful discharge have not fared well (see, O'Connor v. Eastman Kodak Co., 65 N.Y.2d 724, 492 N.Y.S.2d 9, 481 N.E.2d 549; Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86; Collins v. Hoselton Datsun, 120 A.D.2d 952, 503 N.Y.S.2d 203; Citera v. Chemical Bank, 105 A.D.2d 636, 481 N.Y.S.2d 694; Patrowich v. Chemical Bank, 98 A.D.2d 318, 470 N.Y.S.2d 599) (claim dismissed because the language relied on was not sufficient to establish an express agreement); Rizzo v. International Bhd. of Teamsters, 109 A.D.2d 639, 486 N.Y.S.2d 220 (claim dismissed because employee failed to establish detrimental reliance on the assurance of job security).
"In Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, we not only refused to recognize a common-law tort theory of liability based on abusive or wrongful discharge but more important and relevant to the instant case, we refused to adopt the *746 implied covenant of good-faith analysis recognized in some jurisdictions.
"Murphy had alleged that he had been discharged for internally reporting to top management certain alleged accounting improprieties. He contended that his company's internal regulation required him to refrain from engaging in such illegal activities and also compelled the reporting of such activities. On Murphy's breach of contract claim he urged that, although his employment was of indefinite duration there was an implied obligation in all employment contracts to deal fairly and in good faith, and that a termination in violation of that obligation exposes the employer to liability.
"We rejected plaintiff's invitation to find an implied covenant of good faith in the employment contract. In so ruling, we distinguished an employment contract from other types of contract where the implied-in-law theory has been adopted. Noting that a covenant of good faith can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract, we stated: `New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of the party to a contract may be implied and, if implied, will be enforced (e.g., Wood v. Duff-Gordon, 222 N.Y. 88 (118 N.E. 214); Pernet v. Peabody Eng. Corp., 20 A.D.2d 781 (248 N.Y.S.2d 132)). In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship * * in which the law accords the employer an unfettered right to terminate employment at any time. In the context of such an employment it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination * * * to imply such a limitation from the existence of an unrestricted right would be internally inconsistent.' (Id., [58 N.Y.2d] at 304-305, 461 N.Y.S.2d 232, 448 N.E.2d 86). Lastly, we concluded that Murphy had failed to establish an express limitation on the employer's right of discharge under the strict guidelines established in Weiner. Id., [58 N.Y.2d at 305, 461 N.Y.S.2d 232, 448 N.E.2d 86].
"Dispositive in Murphy was plaintiff's failure to establish an express limitation on his employer's right of discharge, (id., [58 N.Y.2d] at 305 [461 N.Y.S.2d 232, 448 N.E.2d 86]; accord, O'Connor v. Eastman Kodak Co., 65 N.Y.3d 724, 492 N.Y.S.2d 9, 481 N.E.2d 549, supra). Although plaintiff had made general references to an employer's manual, he cited no provisions pertinent to the right to terminationcertainly none rising to the explicit restriction that, in the circumstances of Weiner, was found to be actionable. Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 448 N.E.2d 86, supra.
"As in Murphy, plaintiff Sabetay has failed to demonstrate a limitation by express agreement on his employer's unfettered right to terminate at will, and all four of the breach of contract causes of action must be dismissed. To the contrary, the language in Sterling's personnel handbook, "Accounting Code" and employment application refutes any possible claim of an express limitation. The personnel manual was circulated to an extremely limited number of Sterling managerial employees solely for the purpose of determining post-termination benefits, and plaintiff was not one of those few employees authorized to receive a copy. Similarly, the "Accounting Code" and statement on the employment application requiring Sterling employees to abide by company rules do not, taken together, rise to an express agreement that Sterling would not dismiss an employee for following its policies of full disclosure of business improprieties. Rather, these two documents merely suggest standards set by Sterling for its employees' performance of their duties that, without more, cannot be actionable.
"We have noted that significant alteration of employment relationships, such as the plaintiff urges, is best left to the Legislature. See, Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 301-302, 461 N.Y.S.2d 232, 448 N.E.2d 86, because stability *747 and predictability in contractual affairs is a highly desirable jurisprudential value.
"Indeed, the Legislature has responded to this appropriate sensitivity by enacting numerous protections against abusive discharge and by prohibiting employers from discharging at-will employees for reasons contrary to public policy (see, Judiciary Law § 519; Executive Law § 296(1)(e); Labor Law §§ 215, 740; Civil Service Law § 75-b).
"In sum, to sustain the plaintiff's complaint in this case, the court would have to relax the Weiner requirements, to expand the Weiner holding into the implied contract category, and to overrule the recently resolved Murphy rejection of implied covenants in employment relationships. Based on stare decisis principles and sound contractual and policy reasons, we do not believe we should do any of those things, no less all of them."
In Duldulao v. Saint Mary of Nazareth Hosp., the Illinois Supreme Court, following the case of Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn.1983), which is relied upon so heavily by the majority as persuasive authority, did hold, as follows:
"Nearly all courts agree on the general rule, that an employment relationship without a fixed duration is terminable at will by either party. Those courts which hold that an employee handbook can never create enforceable job security rights appear to apply this general rule as a limit on the parties' freedom to contract. The majority of courts, however, interpret the general `employment-at-will rule' as a rule of construction, mandating only a presumption that a hiring without a fixed term is at will, a presumption which can be overcome by demonstrating that the parties contracted otherwise. We agree with the latter interpretation.
"We find particularly persuasive the opinion of the Supreme Court of Minnesota in Pine River State Bank v. Mettille (Minn.1983), 333 N.W.2d 622, which analyzed an employee handbook in terms of the traditional requirements for contract formation; offer, acceptance, and consideration (333 N.W.2d 622, 625). In Pine River an employee handbook was distributed to the plaintiff several months after he began working for defendant. (333 N.W.2d 622, 624.) The handbook contained a section entitled `Job Security' which described the generally secure nature of employment in the banking industry. (333 N.W.2d 622, 625-26 & 626 n. 2.) The court held that this section of the handbook did not constitute an offer because it contained no definite promises. (333 N.W.2d 622, 630.) The handbook, however, also contained a section entitled `Disciplinary Policy,' which stated that `[i]f an employee has violated a company policy, the following procedure will apply * * *.' (333 N.W.2d 622, 626 n. 3), followed by a step-by-step process of progressive discipline ending with `[d]ischarge from employment for an employee whose conduct does not improve as a result of the previous action taken' (333 N.W.2d 622, 626 n. 3). The court held this to be a specific offer for a unilateral contractthe bank's promise in exchange for the employee's performance, i.e., the employee's labor. (333 N.W.2d 622, 630.) By performing, the employee both accepted the contract and provided the necessary consideration, and thus the bank's dismissal of the plaintiff without the benefit of the progressive disciplinary procedures constituted a breach of the employment contract. 333 N.W.2d 622, 630-31.
"Following the reasoning in Pine River, we hold that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after *748 learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed."
I would point out, however, that in Duldulao, the Court was considering the question for the first time. In Alabama, we have already considered the question and have direct authority to the contrary. Cunningham, supra; White v. Chelsea Industries, Inc., supra. I am of the opinion that the Cunningham and White decisions are controlling in this case. White is cited in Duldulao as a decision that reached a result opposite from that of Duldulao.
The New York court in Edwards v. Citibank, N.A., supra, set forth the contract principles that this Court applied in White, and which, in my opinion, are the law of this state:
"Plaintiff readily admits both that for the six years of his employment by defendant he had no formal written contract and no fixed term of employment. Rather, he contends that various staff handbooks and manuals, along with other literature setting out broad employment policy guidelines, comprise a written contract. Moreover, he claims that the effect of these documents is to give him a permanent position, unlimited in duration terminable by him at will, but by Citibank only for cause. Such a position is supported by neither logic nor law. First, it is utterly lacking in mutuality. Second, it is hornbook law that any contract for an indefinite period of time is terminable at the will of either party at any time. Watson v. Gugino, 204 N.Y. 535, 98 N.E. 18 (1912). Such a contract is terminable `fr any reason or for no reason.' Laiken v. American Bank & Trust Co., 34 A.D.2d 514, 308 N.Y.S.2d 111 (1st Dept., 1970). Third, the various manuals offered by plaintiff do not constitute a written employment contract, since they do not exclusively and completely define the terms and conditions of employment, its duration or the rate of compensation i.e., all the essential elements of a contract of employment. Chin v. American Telephone & Telegraph Co., 96 Misc.2d 1070, 410 N.Y. S.2d 737 (1978), unam. aff'd n.o. 70 A.D.2d 791, 416 N.Y.S.2d 160 (1979). Consequently, these documents are no more than broad internal policy guidelines which cannot be held to embody the exclusive procedures for termination."
100 Misc.2d at 60, 418 N.Y.S.2d at 270. In fact, the opinions in White and Edwards and the most recent decision of the New York Court of Appeals in Sabetay are like mirror images of each other.
Ninety-six years ago, in Howard v. East Tennessee, Virginia & Georgia Railroad, 91 Ala. 268, 8 So. 868 (1891), this Court adopted what is commonly known as the employment-at-will rule. The rule, stated simply, is that "an employment contract at will may be terminated by either party with or without cause or justification." Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130, 1131 (Ala.1977). The employer may fire, or the employee may quit, for "a good reason, a wrong reason, or no reason." Id.
The employment-at-will rule had gained widespread acceptance in this country by the turn of the century. Note, The Employment at Will Rule, 31 Ala.L.Rev. 421, 424 (1980). As an extension and reflection of the laissez-faire /freedom-of-contract philosophy of the day, the rule was perceived as a step forward from the preceding era's paternalistic attitude in employment relationships. Comment, Employment-at-Will: Defining the Parameters, 16 Cumb.L.Rev. 377, 390 (1986) (hereinafter cited as Comment, Employment-at-will). See also, Note, Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception, 96 Harv.L.Rev. 1931 (1983) (hereinafter cited as Note, Protecting Employees at Will).
In recent years, the employment-at-will rule has been severely criticized by legal commentators as being "unacceptable in light of today's economic, technological, and sociological realties." See Note, Protecting Employees at Will, supra, at 1931, *749 n. 3. Comment, The At-Will Doctrine: A Proposal to Modify the Texas Employment Relationship, 36 Baylor L.Rev. 667, 668 (1984) (hereinafter cited as Comment, The At-Will Doctrine). The rule's strict application has received criticism for protecting the employer "who instead of terminating employees only when he has grounds to do so," discharges them with "caprice, vindictiveness, or malice." Id. at 667. A majority of courts now recognize, or have indicated that they will recognize, some form of exception to the employment-at-will rule in an effort to ameliorate its sometimes unjust results. Id. at 668.
This Court has not been blind to the fact that "[t]he rule has been applied to obtain harsh and inequitable results" in Alabama. Meredith v. C.E. Walther, Inc., 422 So.2d 761, 762 (Ala.1982). We have consistently refused, however, to recognize an exception to the employment-at-will rule. In Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977), this Court, in a modern-day pronouncement of the rule, explained why it would not adopt an exception: An exception would (1) "abrogate the inherent right to contract between employer and employee"; (2) "overrule existing Alabama law"; and (3) invade the province of the legislature, the body best suited for the creation of such an exception. Id. at 1131.
Following Tranquilaire, we received a deluge of appeals requesting that we overrule Tranquilaire and adopt a public policy exception to the employment-at-will rule. Williams v. Killough, 474 So.2d 680 (Ala. 1985); Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala.1984); Reich v. Holiday Inn, 454 So.2d 982 (Ala.1984); Johnson v. Gary, 443 So.2d 924 (Ala.1983); Kitsos v. Mobile Gas Service Corp., 431 So.2d 1150 (Ala.1983); White v. Chelsea Industries, Inc., 425 So.2d 1090 (Ala.1983); Dreyspring v. Kar Products, Inc., 422 So.2d 764 (Ala.1982); Meredith v. C.E. Walther, Inc., 422 So.2d 761 (Ala.1982); Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala. 1982); Bender Ship Repair, Inc. v. Stevens, 379 So.2d 594 (Ala.1980); Newby v. City of Andalusia, 376 So.2d 1374 (Ala. 1979); Bierley v. American Cast Iron Pipe Co., 374 So.2d 1341 (Ala.1979); Martin v. Tapley, 360 So.2d 708 (Ala.1978). In Bender Ship Repair, Inc. v. Stevens, 379 So.2d 594 (Ala.1980), we declined to adopt such an exception and upheld the right of an employer to discharge an employee for his absence from work based upon his response to a subpoena for jury duty. We again declined to modify the Tranquilaire employment-at-will rule in Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala. 1984). There, we upheld an employer's right to fire an employee for the sole reason that he brought against his employer a worker's compensation claim for job-related injuries.
Our holdings in Bender Ship Repair and Meeks prompted the legislature to enact Code 1975, § 12-16-8.1 and § 25-5-11.1 (Cum.Supp.1985). These sections read as follows:
§ 12-16-8.1:
"(a) No employer in this state may discharge any employee solely because he serves on any jury empanelled under any state or federal statute; provided, however, that the employee reports for work on his next regularly scheduled hour after being dismissed from any jury.
"(b) Any employee who is so discharged shall have a cause of action against the employer for said discharge in any court of competent jurisdiction in this state and shall be entitled to recover both actual and punitive damages.
"(c) The provisions of this section are supplemental to any statutes, existing or to be enacted in the future, that are designed to protect and safeguard a citizen's right and duty to serve on a lawful jury, and the provisions of this section shall not repeal or supersede the provisions of any law not directly inconsistent herewith."
§ 25-5-11.1:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover worker's compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety *750 rule pursuant to subdivision (c)(4) of section 25-5-11."
These expressions by our legislature concerning the public policy of this state as regards employment-at-will, shows that the legislature has changed the pure application of the employment-at-will rule. Also the socio-economic reasons that produced the employment-at-will rule in this country in the first place, and made its pure application desirable, may no longer exist, but this Court, until today, has refused to adopt even a narrow "public policy" exception to the rule. Jones v. Ethridge, 497 So.2d 1107 (Ala.1986). Until today this Court has refused to expand the principles of contract law in handbook cases. Cunningham, supra; White, supra.
The majority correctly states that an "increasing number of jurisdictions have given contractual effect to language contained in handbooks," but most of those cases have been decided since 1980, and that is no reason to distinguish or overrule Cunningham and White, decided in 1983 and 1986 respectively. Most states do not follow the rule this Court adopted in Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977), and followed in Jones v. Ethridge, supra, and while I have not independently checked the law of each of the jurisdictions that have recognized that an employee handbook can create an implied, binding obligation on the employer, I know that various states have rules of law applicable to employment contracts which are different from the Alabama rule. Many states may regulate hiring and firing practices more minutely than does Alabama. Some of these principles are set out in Sabetay, from which I quote extensively, because it states what I thought the Alabama rule was.
While this Court has the power to distinguish the Cunningham and White cases, or to overrule them, I believe the principle of stare decisis is especially applicable to cases of such recent vintage, particularly where the public policy reasons behind the cases has not been changed, either legislatively or judicially. Sabetay, supra.
Assuming, however, that Cunningham and White stand only for the proposition that each employer-employee dispute involving an employee handbook or manual will be reviewed on a case-by-case basis, I still, nevertheless, cannot find the cases to be distinguishable.
In White, the employee contended that he could be discharged only "for cause," because of handbook language stating:
"TERMINATION
"Any employee will be discharged if he cannot or will not do satisfactory work after proper instruction and trial, or if his behavior or attendance record does not meet the company's minimum acceptable standards. We reserve the right to terminate any employee during the first 90 days of employment without cause...." (Emphasis added.)
This Court concluded that, contrary to the employee's contention, the handbook language did not limit the employer's right to discharge its employees for any reason.
In the present case, the plaintiff's employee handbook read, in part:
"Your first six months on the job are a probationary period in which your supervisor will evaluate your capabilities and you can become acquainted with the responsibilities of your work. During this trial period, employees can be terminated at any time if their supervisors conclude that they will not meet job performance standards after reasonable training. At the end of the six months, you are considered a regular permanent employee."
At another point, the handbook in this case provides, under the heading "Constructive Discipline," as follows:
"If disciplinary action is necessary, it generally is taken in the order below, although a serious offense might warrant taking more serious action.
"1. Oral warnings in private are an effort to correct the employee's actions.
"2. Written warnings are a more serious attempt at correction and become part of an employee's record.
"3. Suspension occurs only with the approval of the department head and division *751 personnel manager and is without pay.
"4. Discharge occurs when management believes the employee will not change behavior patterns.
"The types of offenses for which the four-step disciplinary process would generally be followed include: tardiness, poor work performance because of negligence, excessive absenteeism, violation of company traffic or parking regulations, use of profane or abusive language, horseplay or pranks, unauthorized solicitations of any kind, posting or distributing unauthorized materials." (Emphasis added.)
The word "generally," which is used in the handbook, in my opinion, means "usually," and the words "generally" and "normally" are used in the "manual" in Cunningham, but even if the handbook here was held to create a binding obligation, I believe the language used in this handbook and the language used in the handbook in the Pine River case cited by the majority are easily distinguishable. In that case, the handbook section entitled "Disciplinary Policy" provided as follows:
"In the interest of fairness to all employees the Company establishes reasonable standards of conduct for all employees to follow in their employment at Pine River State Bank. These standards are not intended to place unreasonable restrictions on you but are considered necessary for us to conduct our business in an orderly and efficient manner.
"If an employee has violated a company policy, the following procedure will apply:

"1. An oral reprimand by the immediate supervisor for the first offense, with a written notice sent to the Executive Vice President.
"2. A written reprimand for the second offense.
"3. A written reprimand and a meeting with the Executive Vice President and possible suspension from work without pay for five days.
"4. Discharge from employment for an employee whose conduct does not improve as a result of the previous action taken.

"In no instance will a person be discharged from employment without a review of the facts by the Executive Officer." (Emphasis added.)
Pine River, 333 N.W.2d at 626 n. 3. The language in the Pine River handbook is mandatory, whereas the language in the Roche handbook could be described as hortatory.
The plaintiff cites this Court to several of its decisions involving employee relationships with American Cast Iron Pipe Company (ACIPCO). See Farlow v. Adams, 474 So.2d 53 (Ala.1985); Smith v. American Cast Iron Pipe Co., 370 So.2d 283 (Ala. 1979); Duff v. American Cast Iron Pipe Co., 362 So.2d 886 (Ala.1978). The majority relies on these decisions to support the result it reaches here. Duff was decided in 1978, long before the decisions in Cunningham and White, and this Court, in Cunningham and White, apparently attached no significance to the ACIPCO cases. I believe those case are inapposite here. ACIPCO's relationship with its employees is unique to the world of business and must be considered sui generis. As was discussed in Farlow, supra, the employment relationship at ACIPCO is a hybrid of employment contract principles and trust principles, and the employees actually have a role in managing the company; therefore, decisions in those cases are not controlling on the case at hand.
Because I believe no enforceable obligation was breached by Roche, I believe the trial court erred in failing to direct a verdict in Roche's favor on the contract count. For that reason, I would reverse the judgment of the trial court.
It is possible that I should apply the principle Judge Cardozo advanced:
"`That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established *752 and settled judgment of society.'" B. Cardozo, The Nature of the Judicial Process 151 (1921) (quoting Dwy v. Connecticut Co., 89 Conn. 74, 99 [92 A. 883] (1915))."
Nevertheless, the doctrine of stare decisis is a powerful force in our jurisprudence. While I recognize that it should never be used to perpetuate error, it seems inappropriate for this Court to overrule two cases decided within the past four years and to establish a principle of contract law in employer-employee relationships that can be expanded to cover oral agreements or implied agreements.
The litigant here is afforded better treatment than were the litigants in Cunningham and White. Personally, I do not favor a termination-at-will doctrine that allows an employer to fire an employee under circumstances like those in Hinrichs and in Jones v. Ethridge, but the legislature has convened several times since the Hinrichs case was decided, and has not overturned the doctrine of that case. It has, as pointed out in this dissent, addressed two of our cases, Meeks, supra, and Bender Ship Repair, supra, but it has not dealt with the whole termination-at-will doctrine; therefore, it is aware of the public policy issues. Sabetay, supra.
I believe that the legislature is the appropriate body of government to address the policy considerations arising out of employer-employee relationships. Many employees are granted job security and fringe benefits by civil service laws, union contracts, or specific individual contracts, which state the term of employment and the benefits available and the rights of the parties in case of disagreement. There are many laws, state and federal, which restrict employer hiring and firing practices that are discriminatory or constitute an unfair labor practice.
As I have already pointed out, the termination-at-will doctrine has been severely criticized, and several jurisdictions admittedly follow the new rule announced by this Court today when there is an employee handbook or manual, and maybe I should join the majority in this case and determine that the old termination-at-will doctrine, and the requirement of mutuality of contract in employer-employee relationships should no longer be followed, but I cannot do so in this case. Sabetay, supra.
At the very least, I would give the legislature a chance to adopt a state policy before declaring it by case law. See Utica Mutual Ins. Co. v. Tuscaloosa Motor Co., 295 Ala. 309, 329 So.2d 82 (1976), wherein a three-judge plurality wrote:
"If, in the future, the Commissioner of Insurance, because of limitations of manpower and time, is not able to cause filed forms of policies of insurance to be scrutinized under the standards set out in § 322 [Tit. 28A, Code of 1940] and in particular § 322(5), this court may be compelled to declare the public policy of this State per the views expressed by Justices Jones and Shores in their dissent in this case." (As quoted in my dissenting opinion in Wixom Bros. Co. v. Truck Insurance Exchange, 435 So.2d 1231, at 1235 (Ala.1983).)
The legislature is in a better position to determine the specific public policy considerations and to strike a balance between the competing interests, in my opinion; therefore, for those reasons, I must respectfully dissent.
HOUSTON, J., concurs.
NOTES
[1] Both Meeks and Bender Ship Repair have been effectively abrogated by the legislature's adoption of statutory rules to the contrary. See Code of 1975, § 12-16-8.1, which overruled Bender Ship Repair and Code of 1975, § 25-5-11.1, which overruled Meeks.

We especially note that this Court's decision in Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986), although it discusses public policy, should not be read as recognizing a public policy exception. Indeed, the cases cited in this case decided after Harrell indicate that it cannot be so read.
[2] While we also find much of what the Toussaint court stated to be well-reasoned and logical, we find the actual analysis used in Pine River to be more consistent with traditional contract principles than Toussaint. The analysis used and the result in Toussaint is similar to that found in Pine River, but Pine River is more specific in its analysis.
[3] Interestingly, under this analysis, it does not matter whether the offer is made at the time of original hiring or after the employee has been hired. Consideration is supplied by the employee's performance, in either context, when he is not required to perform. See Pine River, 333 N.W.2d at 629-30.
[4] Thus, in a very real sense, the employee is still an employee "at-will." He may still be dismissed for any reason, good or bad, as long as the provisions found in the company handbooks are followed and he is given credit for those benefits which have accrued.
[5] For example, in a section entitled "constructive discipline," the following promise is made:

"The only restrictions the company puts on your conduct are those necessary to insure proper operation of the business, safe working conditions, and protection of the company's property and processes.
"Occasionally, an employee may violate a rule of good conduct. In such a case, the disciplinary procedures outlined here are applied. The purpose of disciplinary action is to correct the deficiency and help make an employee more valuable. Penalties are used only as a last resort.
"Before taking any disciplinary action, a supervisor attempts to get all the facts: Was the misconduct accidental or willful? Has the employee had similar incidents? Did other circumstances contribute to the incident?
"If disciplinary action is necessary, it generally is taken in the order below, although a serious offense might warrant taking more serious action.
"1. Oral warnings in private are an effort to correct the employee's actions.
"2. Written warnings are a more serious attempt at correction and become part of an employee's records.
"3. Suspension occurs only with the approval of the department head and division personnel manager and is without pay.
"4. Discharge occurs when management believes the employee will not change behavior patterns.
"The types of offenses for which the four-step disciplinary process would generally be followed include: tardiness; poor work performance because of negligence; excessive absenteeism; violation of company traffic or parking regulations; use of profane or abusive language; horseplay or pranks; unauthorized solicitations of any kind; posting or distributing unauthorized materials.
"The types of serious offenses that might lead to discharge or suspension as a first penalty include: unauthorized removal, possession, or destruction of company or employee property; conviction of homicide, rape, assault and battery, assault with a deadly weapon, grand larceny, illegal possession or sale of narcotics, or other crime of violence; unauthorized possession on company property of intoxicating beverages, narcotics, or substances that state or federal statutes define as controlled; theft or unauthorized sale, use, or diversion of substances defined by state or federal statutes as controlled; unauthorized possession of weapons of any kind on company property; gambling on company property; insubordination or willful disregard of an order; willful neglect of duty; willful disregard of safety instructions; willful falsification of company records; smoking in research, manufacturing, warehouse, or storage areas (other than in designated smoking areas); absence for three consecutive workdays without reporting to your supervisor; knowingly writing on someone else's time card or falsifying a time card.
"The development and manufacture of controlled substancesour businessis very sensitive. Roche must meet security requirements set by the Drug Enforcement Agency. If you know of drug diversion or theft by an employee, it is your responsibilty to inform the Security Department. Information will be kept confidential and reasonable steps will be taken to protect your identity.
"Taking pictures inside the plant is not allowed, although it is not necessarily a disciplinary offense. If you have to take photographs connected with your work, contact the Manager of Audio Visual Services."
An employee could reasonably, and justifiably, believe that, unless he had committed one of the expressly enumerated "serious offenses," the disciplinary pattern would follow the four-step process listed in the manual.
We note that Roche argues in its brief that Campbell was actually fired for "insubordination"one of the enumerated serious offensesand could, therefore, be discharged for a first offense. However, no such argument was made at trial. Therefore, it should not be considered. See, e.g., First National Bank of Pulaski, Tennessee v. Thomas, 453 So.2d 1313 (Ala.1984). Even if it had been argued, it is clear that whether or not, as a matter of fact, the discharge had been made because of insubordination would have been a question of fact for the jury. The jury could have decided the issue adversely to Roche.
[6] There is some dispute as to whether the handbook at issue was actually issued after he had began working for Roche or at the time he was hired. As explained earlier, the resolution of this fact is of no significance as long as Campbell continued to work after he became aware of the handbook policies.
[7] We do not find it necessary to set out these benefits verbatim, as their existence has never been in dispute.