729 So.2d 330 (1997)
Danny STOKES and Phillip Williams
v.
AMOCO FABRICS AND FIBERS COMPANY, INC.
No. 2960609.
Court of Civil Appeals of Alabama.
October 24, 1997.
Rehearing Denied December 5, 1997.
Truman M. Hobbs, Jr., of Copeland, Franco, Screws & Gill, P.A., Montgomery, for appellants.
David J. Middlebrooks of Lehr Middlebrooks Price & Proctor, P.C., Birmingham, for appellee.
HOLMES, Retired Appellate Judge.
In December 1992 Danny Stokes and Phillip Williams filed a multi-count complaint against Amoco Fabrics and Fibers Company, Inc. (Amoco), and Cary Baker, alleging breach of contract and fraud by misrepresentation and suppression. Specifically, the breach of contract claim was against Amoco, and the fraud claims were against both Amoco and Baker.
Amoco and Baker filed an answer and a counterclaim. Amoco and Baker also filed a motion for a summary judgment, along with documentation, and a brief in support of the summary judgment motion.
In January 1997 the trial court issued an order, entering a summary judgment in favor of Amoco and Baker and dismissing the present action with prejudice. The trial court's order stated the following, in pertinent part:

*331 "The court notes, in particular, its opinion that there is no genuine dispute as to:
"(1) The fact that [Stokes and Williams] were at-will employees. [Stokes and Williams] or Amoco were free to terminate the employment agreement at any time.
"(2) The fact that Amoco sold the Andalusia Mills facility, effective midnight September 25, 1992.
"(3) The fact that [Baker] became an employee of Shaw Industries [the purchaser of the Andalusia Mills facility] in a managerial capacity and was acting as such in determining who would be offered jobs by Shaw Industries.
". . . .
"There is evidence from which a jury might conclude that the decision made on behalf of Shaw Industries to ignore [the] seniority [of Stokes and Williams] at Amoco and [to] offer them employment as entry level creel hands rather than [as] mechanics was arbitrary or unfair. Such conduct, however, does not rise to the level of an actionable, legal wrong."
The trial court's order also stated, "There being no just reason for delay, entry of judgment is final."
Stokes and Williams appeal. This case is before this court pursuant to Ala.Code 1975, § 12-2-7(6).
In their brief Stokes and Williams concede that the summary judgment was proper as to the fraud claims and state that they appeal only as to the breach of contract claim. Consequently, this appeal deals only with the breach of contract claim against Amoco.
On appeal Stokes and Williams contend that the trial court committed reversible error when it entered a summary judgment in favor of Amoco.
Rule 56(c), Ala. R. Civ. P., provides that a summary judgment is appropriate in situations where no genuine issue of any material fact exists and the movant is entitled to a judgment as a matter of law. It is well settled that the moving party has the burden of establishing that no genuine issue of a material fact exists and that all reasonable uncertainties regarding the existence of a genuine issue of a material fact must be resolved against the moving party. Porter v. Fisher, 636 So.2d 682 (Ala.Civ.App.1994).
Once the movant makes a prima facie showing that no genuine issue of a material fact exists, then the burden shifts to the non-moving party to present substantial evidence regarding the existence of a genuine issue of a material fact. Porter, 636 So.2d 682.
We would note that the court must view the evidence in a light most favorable to the non-moving party and that all reasonable doubts must be resolved against the moving party. McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957 (Ala.1992).
As previously noted, the trial court determined "that there is no genuine dispute as to: (1) The fact that [Stokes and Williams] were at-will employees. [Stokes and Williams] or Amoco were free to terminate the employment agreement at any time." However, we would question the trial court's determination that Stokes and Williams were at-will employees in light of Amoco Fabrics & Fibers Co. v. Hilson, 669 So.2d 832 (Ala. 1995).
In Hilson, employees from this same Andalusia facility filed a complaint against Amoco, seeking damages for breach of contract for Amoco's violation of the vacation pay policy found in the employee's handbook. The trial court entered a summary judgment in favor of the employees. In affirming the trial court's judgment, our supreme court stated the following, in pertinent part:
"There are three issues on appeal: 1) whether the circuit court correctly entered a summary judgment in favor of the employees on the claim that the Handbook contained an offer of vacation pay subject to acceptance by the performance of work even though Amoco claims the Handbook contained an express disclaimer of contractual liability and Amoco claims to have followed the explicit terms of its vacation policy....
". . . .
"Amoco argues that the trial court erred in entering the summary judgment in favor of the employees on the breach of contract claim, holding that Amoco's vacation *332 pay policy, as contained in the employee handbook, gave rise to a unilateral contract. We disagree.
". . . .
"... [W]e also agree with the circuit court in this case that the Amoco handbook created a unilateral contract regarding vacation pay policy.

"Amoco not only communicated the policy in its handbook, but actually followed the policy, posting unpaid vacation pay to a liability account as it accrued."
Hilson, 669 So.2d at 834-35 (emphasis added).
We recognize that Hilson involved the handbook given to Amoco employees, while the present case involves the Amoco Policy and Procedures Manual (manual). The evidence reveals that Amoco made the manual available for review by Amoco employees and that Amoco communicated to its employees the policies contained in this manual. Stokes and Williams testified that they were repeatedly told that seniority controlled everything at the Andalusia facility.
Stokes also testified to the following: Just prior to the sale to Shaw Industries (Shaw), he heard rumors that there would be layoffs in the maintenance department when the sell-out occurred. When he inquired in the human resources department as to how any such layoffs would be handled, they consulted the manual and advised him that the layoff and reduction-in-work-force policy in the manual dictated that any such layoffs would be handled by seniority.
It appears that in the present case, as in Hilson, 669 So.2d at 835, "Amoco not only communicated the policy [to its employees], but actually followed the policy." Consequently, the facts in the present case, when read in light of Hilson, would indicate that Stokes and Williams were not at-will employees.
Additionally, we would note that Amoco argues in the present case, as it did regarding the handbook in Hilson, that the manual contains a disclaimer of contractual liability. We would note that while our supreme court's opinion in Hilson mentioned the disclaimer issue, it was not discussed. However, as previously noted, our supreme court determined in Hilson that a unilateral contract existed between Amoco and the employees. This court is bound by the decisions of our supreme court. Ala.Code 1975, § 12-3-16.
Additionally, we would note that there was evidence that the disclaimer language was added in 1990, several years after Stokes and Williams were hired. Both Stokes and Williams testified that they were never told about this disclaimer language.
In light of the foregoing, we find that Stokes and Williams were not at-will employees of Amoco.
Our review of the record reveals the following pertinent facts: Stokes began working for Amoco at its Andalusia facility in 1985, and Williams began working for Amoco at its Andalusia facility in 1987. Both Stokes and Williams began working for Amoco in the entry level position of creel hand and progressed to the position of industrial mechanic, grade four. Stokes and Williams worked for Amoco until September 25, 1992.
On September 25, 1992, Amoco sold its Andalusia facility to Shaw, with the sale being effective at midnight on that date. At midnight on September 25, 1992, all employees at the Andalusia facility (except for a few managerial employees who were transferred to other Amoco facilities) ceased to be Amoco employees, and their jobs with Amoco terminated.
Stokes and Williams contend that Amoco failed to follow its policies regarding layoffs, work reduction, and seniority when, on the afternoon of September 25, 1992, it terminated the employment of seven industrial mechanics, including Stokes and Williams. Amoco's Policies and Procedures No. 4.02, which deals with LayoffReduction in Work Force, states the following, in pertinent part:
"1. Whenever it is necessary to reduce the number of employees within a job classification the employee within that classification with the least job seniority will be reduced from that job."
In his deposition Stokes testified to the following:

*333 "A. ... I mean, in my opinion, I was told by Mr. Sutton, hey, Shaw told us we have got to reduce the maintenance department by seven. Someone at Amoco terminated seven employees. They picked the seven. ...
"Q. Are you saying that Amoco determined for Shaw who Shaw would hire?
"A. No, sir. I'm saying Amoco determined for Amoco which seven to terminate to meet Shaw's requirement of thirty-two mechanics.
". . . .
"A. I'm saying that Amoco terminated me to meet the requirement to sell the plant.
"Q. Okay.
"A. They wrongfully terminated me by their own policy.
"Q. By not following seniority?
"A. Yes, sir.
"Q. You wouldn't think Amoco violated their policy if the seven least senior mechanics had not been hired by Shaw?
"A. Right. That's what should have been done. The seven names that were put on the list should have been the least mechanics by job seniority."
Amoco maintains that on the afternoon of September 25, 1992, it did not terminate the employment of any of its employees. We would note that it is undisputed that at midnight on September 25, 1992, all Amoco employees at the Andalusia facility, except for those previously mentioned, ceased to be Amoco employees, and their jobs with Amoco terminated.
Cary Baker, an Amoco employee at its Andalusia facility, became a Shaw employee after Shaw purchased Amoco's Andalusia facility. Baker admitted that on September 25, 1992, he was an Amoco employee, but he maintains that he was making employment decisions on behalf of Shaw, not Amoco. Baker testified to the following in his deposition:
"Q. Tell me what you understand happened on the afternoon of [September] 25th with regard to [Stokes and Williams].
"A. What was to happen on the afternoon of the 25th, we had final confirmation of what the job offers were going to be, the number of mechanics and people. They were to be told that they were notthey did not receive job offers as industrial mechanics. They were receiving job offers as texture and creel hands or entry level positions with Shaw."
Baker also testified to the following:
"A. Again, as I think I have already answered, there wasn't a policy to follow because all Amoco employees had ended their employment that day with the sale of the plant. The people that had other job offers from Shaw were made aware of them on that day of what the jobtheir specific job offer would be for employment with Shaw.
"Q. So the job offered to these guys was not pursuant to any policy of Amoco with regard to reductions in force?
". . . .
"A. It was an employment decision by Shaw.
"Q. Not made pursuant to any policy with regard to reduction in force?
". . . .
"A. It was not an Amoco decision at all."
Baker stated that he compiled the list of seven industrial mechanics to whom Shaw was planning to offer entry level creel hand positions rather than positions as industrial mechanics and that he instructed John Sutton to tell these individuals. Baker testified as follows:
"Q. What were your instructions to Mr. Sutton about what to tell these guys?
"A. Regarding the job offers?
"Q. Yes, sir.
"A. The instructions were for John [Sutton] to get each one in individually and explain to them that they were not being offered jobs as industrial mechanics for Shaw, that they were being offered entry level positions or creel hand positions with Shaw."
We would note that Stokes testified that John Sutton, the superintendent over maintenance *334 for Amoco, had the authority to terminate Stokes's employment with Amoco. Sutton was another of those individuals who was an Amoco employee on September 25, 1992, and a Shaw employee after the sale of the Andalusia facility.
Stokes testified to the following in his deposition:
"A. ... It was explained to me at first by John Sutton that I was being terminated and that I had an option. I could take a job at a lesser pay. I would go back in as an entrance level employee and I could either take the entrance level job, which was a greater than twenty percent reduction in pay, or I could take severance pay. I said well, you know, you are not going by seniority. You know, what's the problem? I don't understand what's going on. He said well, I'm sorry. All I can tell you is what your options are."
Stokes also testified to the following:
"Q. Mr. Sutton explicitly said you are terminated?
"A. Yes, sir."
Stokes further testified:
"A. When I was called into the office and told this, Mr. Suttonhis words were we have been notified as of 1:30 that we have got to reduce the maintenance department by seven people. They didn't say by Danny Stokes and Phillip Williams. We have got to reduce it by seven people. They will only accept thirty-two mechanics. Someone at Amoco made the decision as to which seven were chosen.
"Q. Who would only accept thirty-two mechanics?
"A. That Shaw Industries only wanted thirty-two mechanics and that they had to reduce the maintenance department by seven before 3:30."
Williams testified to the following in his deposition:
"A. ...I guess we was told that we either had the option to take the severance pay or that Shaw was going to offer us a job as an entry level creel hand.
"Q. Who told you that?
"A. John Sutton was the first to tell us.
"Q. Who was present when he told you that?
"A. Myself and him.
"Q. Okay. And exactly what did he say, to the best of your recollection?
"A. Well, he justwhen he called us incalled me in there, he told me that. He said that Amoco was firing us and that Shawthe only job they would offer us was an entry level creel hand. After that, I pursued it to ask him why us. And he said that there was a big list sent up to Cary Baker and out of that list, he had to pick seven names off of it. And he said we was the only seven names that come back to him."
In light of the foregoing, we find that there existed a genuine issue of a material fact as to what occurred on the afternoon of September 25 1992, i.e., did Amoco terminate the employment of the seven industrial mechanics so that the number of employees in the maintenance department would be reduced in order to meet Shaw's requirement of thirty-two mechanics.
The judgment of the trial court is due to be reversed and the cause remanded for proceedings consistent with this opinion.
The foregoing opinion was prepared by Retired Appellate Judge Richard L. Holmes while serving on active duty status as a judge of this court under the provisions of Ala.Code 1975, § 12-18-10(e).
REVERSED AND REMANDED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., dissent.
THOMPSON, Judge, dissenting.
Our Supreme Court imposed a limitation upon the common law "employee-at-will" rule in Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987). In Hoffman-La Roche the Court allowed various promissory terms communicated between the employer and the employee in an employee handbook to alter the employee's at-will employment status. Id. The Court provided the following three-pronged *335 test to be applied to the facts of each case in determining whether an employee handbook or other company material constitutes a unilateral contract offer:
"First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer."
512 So.2d at 735.
I find that the contents of the policy and procedure manual were not intended by Amoco to be communicated to Stokes and Williams, as required by Hoffman-La Roche, Inc. v. Campbell, and, therefore, that no unilateral offer of contract was made. This document was not disseminated to all employees, but was distributed only to those at the supervisory level. In fact, Stokes testified in his deposition that he learned of the policy concerning layoffs in June 1992, when he questioned a human resources representative about whether a policy existed. Although his deposition testimony clearly demonstrated that he was aware of a seniority policy that was set forth in the employee handbook, Stokes stated that he was unaware of how this policy related to layoffs until he inquired. Had the layoff policy been communicated to him, there would have been no need for his inquiry to a human resources representative. Stokes also testified that he never saw a copy of the policies and procedures manual until the document was shown to him at his deposition.
A finding that a policies and procedures manual extends a unilateral offer of a contract would effectively eradicate the concept of at-will employment for all companies large enough to require internal operating policies and procedures. Indeed, under such a broad interpretation of Hoffman-La Roche, every statement made by a supervisor to an employee regarding company policy could be construed as a unilateral offer of a contract. The court in Hoffman-La Roche explained that general statements of policy do not create unilateral offers. Hoffman-La Roche, 512 So.2d at 734. Our Supreme Court has recognized that some company documents contain general guidelines to be used in the discharge of employees but that those guidelines are not to be construed as contractual limitations on the employer's procedures. See Campisi v. Scoles Cadillac, Inc., 611 So.2d 296 (Ala.1992).
Finally, the policies and procedures document contained the following disclaimer:
"Neither the policies contained herein nor any other communications made by a management representative, either written or oral, made at the time of hire or during the course of employment are intended in any way to create an employment contract or to alter the at-will status of employees."
The Court in Hoffman-La Roche stated that policies contained in company documents would not be enforced as contract provisions against an employer if the documents contain an express disclaimer. 512 So.2d at 734; See Stinson v. American Sterilizer Co., 570 So.2d 618, 621 (Ala.1990). The majority relies in part upon the fact that the disclaimer language was added after Stokes and Williams had become employees. I note that the Supreme Court has held that the addition of specific disclaimer language after an employee had been employed was a proper exercise of the employer's privilege, under the Hoffman-La Roche analysis, to avoid having the provisions construed as an offer for a unilateral contract. Clark v. America's First Credit Union, 585 So.2d 1367, 1370 (Ala.1991).
In addition, the majority cites the Supreme Court decision in Amoco Fabrics & Fibers Co. v. Hilson, 669 So.2d 832 (Ala.1995), as authority for discounting the validity of the express disclaimer found in the policies and procedures manual. The majority appears to reason that, because the Supreme Court in Hilson found that an employee handbook extended a unilateral contract offer, despite the existence of a disclaimer in the handbook, the Supreme Court intended to reject the use of disclaimers as an expression of the employer's intent not to extend a unilateral offer. I disagree. As the majority points out, the use of disclaimer language was not addressed in the Hilson opinion and in Hilson *336 the Court did not base its holding upon this issue. Given the vast body of precedent from the Supreme Court endorsing employers' use of disclaimers, I cannot conclude that the Court would attempt to invalidate disclaimers altogether without some clear statement to that effect. See Davis v. University of Montevallo, 638 So.2d 754 (Ala.1994); Abney v. Baptist Medical Centers, 597 So.2d 682 (Ala.1992); Hanson v. New Technology, Inc., 594 So.2d 96 (Ala.1992); Clark v. America's First Credit Union, 585 So.2d 1367 (Ala.1991); and Stinson v. American Sterilizer Co., 570 So.2d 618 (Ala.1990).
CRAWLEY, J., concurs.