797 So.2d 446 (2001)
BIRMINGHAM PARKING AUTHORITY
v.
Samuel WIGGINS.
1991899.
Supreme Court of Alabama.
March 2, 2001.
Rehearing Denied May 4, 2001.
*447 LaVeeda Morgan Battle and Isaac Roitman of Gorham & Waldrep, P.C., Birmingham, for appellant.
Thomas E. Baddley, Jr., and Jeffrey P. Mauro of Baddley & Mauro, L.L.C., Birmingham, for appellee.
HOUSTON, Justice.
The defendant Birmingham Parking Authority ("the Authority") appeals from a judgment entered pursuant to a jury verdict in favor of the plaintiff Samuel Wiggins on a breach-of-contract claim. Specifically, Wiggins had alleged that the Authority had breached a contract by terminating his employment. We reverse and remand.
From 1985 to 1993, Wiggins was a member of the board of directors of the Authority, which is a public corporation created and operated under the provisions of Ala.Code 1975, § 11-61A-1 through § 11-61A-24. In 1993, Wiggins left his board position to become assistant executive director of the Authority, with responsibility for the cashiering division and, eventually, for security in the Authority's parking facilities. Wiggins did not have a written contract or any agreement for any particular term of employment. However, during his employment, the Authority adopted a personnel policy manual, which was dated October 1, 1994 ("1994 handbook"). The 1994 handbook provided that employees would serve a six-month probationary period (which Wiggins had exceeded), but it did not specifically designate a term of the employment of the Authority's employees; nor did the 1994 handbook provide that it in any way constituted a contract of employment between Wiggins and the Authority. Wiggins continued to work for the Authority after he received the 1994 handbook.
In October 1997, Wiggins took a leave of absence because of the illness of his wife. Wiggins's wife died on November 7, 1997. Wiggins's bereavement caused him to suffer severe stress; he remained on leave, although he would come to the office occasionally in the evening to work. Wiggins's accrued vacation days expired on December 31, 1997. On February 3, 1998, Wiggins was informed by the Authority that his sick leave, vacation leave, and holiday leave were about to run out and that if he needed additional leave he would have to request it under the Family and Medical Leave Act (29 U.S.C. § 2611 (2000)); the Authority told him that in order for leave granted pursuant to that Act to cover the *448 sick-leave days he had already used his request for that leave had to be accompanied by a doctor's statement. Wiggins's doctor wrote the Authority, stating that Wiggins "currently requires an extended leave of absence" and stating that the doctor was "unsure at this time when [Wiggins] will be able to return to work." The Authority granted Wiggins 12 weeks' leave, without pay, under the Family and Medical Leave Act. During this leave, Wiggins applied for and obtained disability compensation under a long-term disability policy the Authority had provided for its employees. Wiggins received disability compensation for the period February 19, 1998, through July 7, 1998.
On April 14, 1998, the Authority advised Wiggins that his 12 weeks' unpaid leave under the Family and Medical Leave Act would expire at the end of April 1998.[1] On April 29, 1998, the day before his leave was to expire, Wiggins, by a letter, requested additional medical leave, because his doctor had not released him to return to work. His letter also stated that if there was a "risk of losing his job," then he would "return to work without that [doctor's] release." However, a May 5, 1998, letter from Wiggins's doctor to the Authority stated that Wiggins was unable to return to work:
"[Wiggins] continues to suffer from Major Depression and Bereavement over the loss of his wife. He currently is unable to perform his regular duties. I anticipate his return to work within 3-6 months."
(Emphasis added.) The Authority did not grant Wiggins additional time, and he was discharged on May 7, 1998.
Wiggins contends that, under the principles stated in Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 735 (Ala. 1987), the 1994 handbook stated the terms of a unilateral contract between Wiggins and the Authority. Under the Hoffman-La Roche analysis, provisions of an employee handbook can become a unilateral contract, thereby altering the at-will status of an employment relationship. See Ex parte Amoco Fabrics & Fiber Co., 729 So.2d 336, 339 (Ala.1998). The question whether an employee handbook creates a unilateral contract between an employee and his employer can be determined by applying the following analysis to the facts in the case:
"First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the *449 offer by [continuing his] employment after he has become generally aware of the offer. [The employee's] actual performance supplies the necessary consideration."
Hoffman-La Roche, supra, at 735.
We conclude that Wiggins presented substantial evidence from which one could find all the elements of the Hoffman-La Roche test. First, he produced substantial evidence indicating that the language contained in the 1994 handbook is specific enough to constitute an offer. The 1994 handbook provided as follows:
"TERMINATION OF EMPLOYMENT

". . . .
"DismissalThe tenure of every employee shall be conditioned on the satisfactory conduct of the employee and the continued, efficient performance of assigned duties and responsibilities. Unsatisfactory job performance will be noted in an employee's personnel file through an official letter of reprimand. Three (3) reprimands placed in an employee's personnel file within a 12 month period will result in dismissal of the employee.
"An employee may be immediately discharged for the following:
". . . .
"10) Absent without leave."
The language of this "Termination of Employment" provision is clear enough that Wiggins, upon reading it, could reasonably have believed that, as long as he worked within the guidelines set out in the handbook, he would not be "immediately discharged" unless he was subjected to one of the circumstances listed in the handbook that would call for termination.
Second, Wiggins produced substantial evidence to support a finding that the issuance of the handbook constituted an offer to him. He acknowledged at trial that he received the 1994 handbook.
Finally, it is undisputed that Wiggins continued to work after the Authority issued the 1994 handbook, in which the Authority informed him of its termination policy. He continued to work until 1998, when he was terminated, long after he had learned of the policy. Therefore, we conclude that the evidence would support a finding that the 1994 handbook stated the terms of a unilateral contract between Wiggins and the Authority.
However, although we agree that the fact-finder could have found a unilateral contract between Wiggins and the Authority, the evidence did not support a finding that the Authority breached that contract when it terminated Wiggins in 1998. The 1994 handbook provided:
"An employee occupying a regular, full time position who is temporarily incapacitated to perform duties, and who is not drawing any form of disability compensation or workers' compensation may be granted unpaid medical leave of absence for no more than one (1) year...."
(Emphasis added.) In May 1998, Wiggins was drawing disability compensation. Under the provision quoted here, the Authority might have had no authority to grant Wiggins additional medical leave; however, it is undisputed that the 1994 handbook did not require the Authority to grant additional medical leave. See 1994 handbook 14 ("An employee ... who is temporarily incapacitated to perform duties ... may be granted unpaid medical leave of absence."). It is also undisputed that the Authority did not grant Wiggins additional leave and, therefore, that on May 7, 1998, Wiggins was absent without leave; he was discharged on that date.
Thus, the record contains no substantial evidence indicating that the Authority *450 breached its unilateral contract with Wiggins.[2] The trial court, which denied the Authority's preverdict motion for a judgment as a matter of law, saying it was ruling "without a great deal of confidence," erred by rejecting grounds 1 and 2 stated in that motion, and it also erred by rejecting ground 11 of the Authority's postverdict motion for a judgment as a matter of law.
REVERSED AND REMANDED.
MOORE, C.J., and SEE, BROWN, HARWOOD, and STUART, JJ., concur.
LYONS and JOHNSTONE, JJ., dissent.
WOODALL, J., recuses himself.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the reversal of the judgment in favor of the plaintiff Wiggins. The record does contain substantial evidence supporting Wiggins's theory that the Birmingham Parking Authority breached the contractual obligations it owed Wiggins pursuant to the 1994 Employee Manual. While Wiggins concedes that the Authority did not necessarily owe him more leave, the breach claimed by Wiggins is not the failure or refusal of the Authority to grant him further leave. Rather, the breach Wiggins claims is that the Authority discharged him without cause.
Because the 1994 Manual creates secure employment as distinguished from employment at will, the Authority could not discharge him without legitimate cause contemplated by the Manual. The existence and legitimacy of cause in this case are jury issues.
The record contains substantial evidence that the Authority did discharge Wiggins *451 without cause. The May 7, 1998 letter by the Authority to Wiggins declaring his "position vacant" reads:
 "May 7, 1998
 "Mr. Samuel E. Wiggins
 825 2nd Street, SW
 Birmingham, AL 35211
 "Dear Sam:
"The Board considered your request for an extended leave of absence at our meeting held on Thursday, May 7, 1998. Although we are sympathetic of your loss which has caused you to be unable to perform your duties as Assistant Director, we feel that it would not be in the best interest of the Birmingham Parking Authority to continue another three to six months without someone in that position. We are, therefore, denying your request for an extension of leave.
"Although you have indicated your willingness to return to the position should your request for an extension be denied, we do not believe that it would be in your best interest nor the Birmingham Parking Authority to have you return to work against the advice of your personal physician. For these reasons, the Board has declared your position vacant.
 "Sincerely,
 "[s/s]
 "Anita B. Foster
 "Chairman of the Board
 "cc: Board Members"
This letter does not purport to invoke any of the grounds for discharge stated in the 1994 Employee Manual. Specifically, this letter does not contend that Wiggins was absent without leave. Indeed, the Authority never argued that Wiggins was absent without leave until the Authority filed its reply brief, its second brief, before us. Rather, the Authority, in its termination letter, attempted to invoke a ground of discharge contained, not in the 1994 manual, but in the 1997 manual, which the main opinion correctly holds not to govern this particular contract dispute.
Wiggins testified that, before his leave expired, he told the Executive Director Voight, that he, Wiggins, would return to work without further leave if he needed to do so in order to save his job, and that Voight told Wiggins that Voight did not think Wiggins needed to do so. Wiggins never altered his position that he was willing to return to work without further leave in order to save his job.
The 1994 Employee Manual does not include inability to return to work as a ground for discharge. If it did, Wiggins's ability to return to work would have been an issue of disputed facts of record, to be determined by the jury.
Wiggins introduced evidence that the Authority was hostile toward him because of his having reported in-house thefts. He further introduced evidence that the Authority waited for five months after it terminated him to replace hima delay almost as long as the longest time expected by Wiggins's doctor before Wiggins could resume his normal duties. The record further contains evidence that, while the board of the Authority tape-recorded its meetings, including the meeting at which the board decided to terminate Wiggins, the board did not tape-record its discussion about terminating Wiggins.
Thus, the record presents a jury question whether the reason stated by the Authority for terminating Wiggins was a mere pretext as distinguished from legitimate cause. Therefore, rather than reverse for the absence of liability, we should proceed to examine the issues of damages.
LYONS, J., concurs.
NOTES
[1] When Wiggins learned that his leave would soon expire, he contacted William Voight, executive director of the Authority. Voight encouraged Wiggins to file with the Authority a request for additional leave. Wiggins, in his brief on appeal, cites page 214 of the record and asserts: "Voight assured the Plaintiff that the [Authority] would `approve' his request for leave, and told him not to return to work." (Emphasis added.) If this statement were an accurate reflection of the record, then one might fairly argue that Voight, as a representative of the Authority, created with Wiggins a contract that the Authority later breached when it denied the request.

However, on page 214 of the trial record, Wiggins's testimony reads: "But, [Voight] assured me thatWell, [Voight] told me that [Voight] thought that the [Authority] would `consider' my request and that [Voight] thought there would be no need for me to come in." (Emphasis added.) Because Voight indicated to Wiggins merely that the Authority would consider Wiggins's request for further leave and did not promise that such a request would be approved, a contract was not formed between the Authority and Wiggins, and any arguments to the contrary are meritless.
[2] During the trial, much was made of the fact that on October 9, 1997 (before Wiggins was terminated), the Authority issued another employee handbook. However, the question whether the employee handbook issued by the Authority on October 9, 1997, rescinded the 1994 handbook is not before us, because the judge gave no jury charge on the law of rescission, no one objected to the failure to give such a charge, and the court did not deny a request for such a charge.

The 1997 handbook provided on the first page: "Nothing contained in this manual should be considered a contract between the [Authority] and an employee. All policies and practices may be changed as conditions or trends warrant." It also stated that "[t]he Authority, in its own best interests, necessarily reserves the right to determine the duration of employment of any individual and hence to discharge an employee with or without cause," and that "[i]f an employee fails to return to work at the conclusion of an approved leave of absence, including any extension of the leave, the employee will be considered to have voluntarily terminated employment."
It is undisputed that Wiggins had received a copy of this 1997 handbook before the Authority terminated his employment on May 7, 1998. "Whether an employee handbook meets [the Hoffman-La Roche test for creating a binding unilateral contract] is a matter of law to be determined by the court." Campisi v. Scoles Cadillac, Inc., 611 So.2d 296, 298 (Ala.1992).
The language in the 1997 handbook was not sufficient to constitute an offer to create a unilateral contract. McCluskey v. Unicare Health Facility, Inc., 484 So.2d 398, 400 (Ala. 1986).
In the 1994 handbook, the Authority did not reserve the right to amend or modify the handbook provisions. If it had, the provisions of the 1997 handbook would have governed the relationship between the Authority and Wiggins, as a matter of law. Hoffman-La Roche, 512 So.2d at 735. However, because the Authority failed to reserve this right, the question whether the 1994 handbook or the 1997 handbook governed the relationship between the Authority and Wiggins on May 7, 1998, would have been determined by the answer to a question of factwhether the Authority and Wiggins had mutually rescinded the unilateral contract created by Wiggins's continuing to work under the provisions of the 1994 handbook. Matthews v. Martin, 394 So.2d 943, 944 (Ala.1981).